IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:08-CT-21-D

KEITH MATHIS, et al.,           )
                                )
              Plaintiffs,       )
                                )
      v.                        )          **ORDER**
                                )
GEO GROUP, INC., et al.,        )
                                )
              Defendants.       )

Louis Calland ("Calland" or "plaintiff") is an inmate at Rivers Correctional Institution ("Rivers") and is the sole remaining plaintiff in this case. Calland contends that defendants GEO Group, Inc. ("GEO"), the Federal Bureau of Prisons ("BOP"), and Harley Lappin ("Lappin"), Director of the BOP, have violated and are violating federal and state law in connection with the medical care that Calland receives and does not receive at Rivers. Calland also complains that the BOP and GEO have denied and are denying him access to programs and facilities at Rivers solely because of his disability. The BOP has a procurement contract with GEO and pays GEO to house federal inmates at Rivers. GEO is a private corporation that owns and operates Rivers. Calland seeks declaratory and injunctive relief and wishes to serve as the class representative for all current and future inmates at Rivers.

GEO, the BOP, and Lappin filed motions to dismiss Calland's amended complaint for failure to state a claim upon which relief can be granted. On October 8, 2009, the court heard oral argument concerning the motions to dismiss. As explained below, the motions to dismiss [D.E. 64, 65] are granted.

I.

On June 28, 2007, ten then-current and former inmates at Rivers filed suit in the United States District Court for the District of Columbia [D.E. 3]. The named plaintiffs were Keith Mathis, Reon Holloway, David Rogers, Benjamin Hamilton, Carl Butler, Harold Robinson, Charles Lewis, John Doe, John Roe, and Jimmie Fowler. Id. ¶¶ 10–19. These plaintiffs sought declaratory, injunctive, and monetary relief against the GEO, the BOP, and Lappin. Id. ¶¶ 21–23; see id. at 46–48. On February 28, 2008, the United States District Court for the District of Columbia transferred the action to the United States District Court for the Eastern District of North Carolina. See Mathis v. GEO Group, Inc., 535 F. Supp. 2d 83, 89 (D.D.C. 2008).

On October 24, 2008, plaintiffs filed an amended complaint [D.E. 50]. In addition to amending their claims, plaintiffs also limited their complaint to seek only declaratory and injunctive relief. See Am. Compl. 40–41. When plaintiffs filed the amended complaint, Mathis, Holloway, Rogers, Hamilton, Butler, Robinson, Lewis, Doe, and Fowler all had been released from Rivers. See id. ¶¶ 17–24; see also Fed. Bureau of Prisons, Inmate Locator, http://www.bop.gov/ inmate_locator/index.jsp (last visited Nov. 9, 2009). Accordingly, the amended complaint named Michael Collins, Louis Calland, and John Roe, then-current inmates at Rivers, as plaintiffs. Am. Compl. ¶¶ 10–12. The amended complaint removed Mathis, Holloway, Rogers, Hamilton, Butler, Robinson, Lewis, Doe, and Fowler as named plaintiffs and listed them instead as "other affected persons." Id. ¶¶ 17–24.

Plaintiffs' amended complaint contains four claims, seeks declaratory and injunctive relief, and proposes to proceed as a class action on behalf of current and future inmates at Rivers. GEO is a private corporation that owns and operates Rivers. The BOP has a federal government procurement contract with GEO and pays GEO to house federal inmates at Rivers, including many

2

inmates serving sentences arising out of their felony convictions in the District of Columbia. Essentially, plaintiffs complain about the medical care that prisoners receive and do not receive at Rivers and the access that prisoners with disabilities have to programs and facilities at Rivers.

On January 5, 2009, the BOP and Lappin (who is sued in his official capacity) filed a motion to dismiss [D.E. 64]. On that same date, GEO also filed a motion to dismiss [D.E. 65]. Defendants argue that plaintiffs fail to state a claim upon which relief can be granted. Plaintiffs responded in opposition [D.E. 72], and defendants replied [D.E. 80, 82].

On July 22, 2009, the case was reassigned from Judge Malcolm J. Howard to Judge James C. Dever III. While the action was pending, Collins and Roe were released from incarceration at Rivers [D.E. 88]. In light of their release and the fact that the amended complaint seeks only declaratory and injunctive relief, Collins' and Roe's claims are moot. See, e.g., Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009). Accordingly, on September 30, 2009, the court dismissed Collins and Roe as plaintiffs and clarified that Calland is the sole remaining plaintiff [D.E. 88].

Rivers is located in Winton, North Carolina, which is within the Eastern District of North Carolina. Am. Compl. ¶ 31. GEO, a private corporation that owns and operates Rivers, has a federal government procurement contract with the BOP. The BOP pays GEO to house federal inmates at Rivers. Id. ¶ 14. The Attorney General may contract with private entities for the housing, care, and custody of federal prisoners. See 18 U.S.C. § 4013(a). Moreover, under the National Capital Revitalization Act of 1997, Congress mandated that the BOP house, in private contract facilities, at least fifty percent of the District of Columbia felony inmate population. See Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734–37 (1997). The need to house the District of Columbia prisoners in private contract facilities arose from the Congressional decision to close the District of Columbia's Lorton Correctional Complex. See id.; see also Virginia v. Reno, 955 F. Supp. 571, 575 (E.D. Va.)

3

(describing history of Lorton Correctional Complex and decision to close Lorton), vacated as moot, 122 F.3d 1060 (4th Cir. 1997) (per curiam) (unpublished). Congress imposed a deadline of September 30, 2003, to have alternative facilities to house D.C. felony offenders. Congress also mandated "private contract facilities" to reduce costs. See Pub. L. No. 105-33, § 11201, 111 Stat. at 734.

Calland claims that, while at Rivers, GEO, the BOP, and Lappin provided him inadequate medical care.[1] Specifically, Calland alleges that he received inadequate medical treatment for his arthritis, degenerative bone disease, and diabetes, resulting in poor health and severe pain. Am. Compl. ¶ 11. He also claims that he is unable to access the facilities, programs, services, and activities at Rivers because of his disability. Id. ¶ 11, 13.

Calland's amended complaint contains four claims. First, Calland claims that the inadequate medical care violates the Eighth Amendment to the United States Constitution and seeks relief from the BOP and GEO. See id. ¶¶ 61–68. Second, Calland claims that the BOP and GEO violated section 504 of the Rehabilitation Act. See Am. Compl. ¶¶ 69–77. Specifically, Calland claims that he has received no physical therapy. Calland also alleges that he uses a wheelchair and claims that he has been denied equal access to the facilities, programs, services, and activities at Rivers because of his physical disability. See id. ¶ 11. In making his Rehabilitation Act claim, Calland alleges that the BOP and GEO have discriminated against him solely by reason of his disability. Id. ¶ 74.

---

[1]The court focuses on Calland's claims because Calland is the sole remaining plaintiff. If Calland's claims fail, then the issues described in the amended complaint concerning Roe, Collins, the "other affected persons," or the putative class members cannot revive the amended complaint. See, e.g., United States v. Hays, 515 U.S. 737, 743–47 (1995); Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477–78 (1990); Allen v. Wright, 468 U.S. 737, 750–51 (1984); Preiser v. Newkirk, 422 U.S. 395, 401–03 (1975).

4

Third, Calland seeks relief under North Carolina law and claims that GEO negligently failed to provide reasonable medical care and treatment to him. Am. Compl. ¶ 79–80. The alleged breaches include:

> (a) the failure to provide access to health care services; (b) the failure to hire, train, supervise and maintain an adequate level of qualified health care staff at Rivers; (c) the failure to establish an adequate and reasonable method for distributing medication; and (d) the failure to contain or treat infectious diseases.

Id. ¶ 80. According to Calland, GEO's negligence proximately caused him to suffer immediate and irreparable injury and a heightened risk of premature death. See id. ¶ 81.

Fourth, Calland claims that the federal government contract between the BOP and GEO was intended to confer the direct benefit of adequate medical, dental, and mental healthcare on plaintiff. Id. ¶ 83. According to Calland, GEO breached and continues to breach its express and implied contractual obligations to Calland by failing to provide adequate healthcare. Id. ¶ 84. Calland claims that GEO's alleged breach has caused him physical pain and injury, and asks the court to order GEO to "perform its obligation to provide adequate health care under the Rivers Contract." Id. ¶¶ 85–87.

Calland seeks to have this action certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure [D.E. 31]. The proposed class would include "current and future prisoners of Rivers who, during their incarceration at Rivers, are dependant upon the organizations, systems, policies, practices, and institutional conditions of Defendants for their receipt of medical, dental, and mental health care." Id. ¶ 39. Calland also seeks to have a sub-class certified to include "all prisoners who have been denied access to the programs, services, facilities, and activities at Rivers because of [the BOP's and GEO's] failures to diagnose, monitor, treat and/or accommodate their serious medical conditions, in violation of Section 504 of the Rehabilitation Act." Id. ¶ 50. Calland seeks declaratory and injunctive relief for himself and those similarly situated. Id. at 41–42.

5

II.

In analyzing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted," a court must determine whether the complaint is legally and factually sufficient. See FED. R. CIV. P. 12(b)(6); Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562–63 (2007); Giarratano v. Johnson, 521 F.3d 298, 301–02 (4th Cir. 2008); Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). In considering a motion to dismiss, a court need not accept a complaint's legal conclusions drawn from the facts. See Ashcroft, 129 S. Ct. at 1949–50. Similarly, a court need not accept as true "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Ashcroft, 129 S. Ct. at 1949–50. Moreover, a court may take judicial notice of public records without converting a motion to dismiss to a motion for summary judgment. See, e.g., FED. R. EVID. 201; Philips v. Pitt County Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009); Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002); Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239–40 (4th Cir. 1989).

III.

A.

First, the court addresses plaintiff's Eighth Amendment claim against GEO. Plaintiff claims that GEO is responsible for providing medical, dental, and mental healthcare under its contract with the BOP, that GEO has been deliberately indifferent to his serious medical needs, and that GEO thereby violated the Eighth Amendment to the United States Constitution. See Am. Compl. ¶¶ 61–68. In making his Eighth Amendment claim, plaintiff denies reliance on Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). GEO responds that regardless

6

of whether plaintiff's Eighth Amendment claim relies on Bivens, the claim requires government action and that GEO's conduct at Rivers does not qualify as government action. See Holly v. Scott, 434 F.3d 287, 289–94 (4th Cir. 2006).

In Holly, a prisoner at Rivers alleged that he had received inadequate medical care at Rivers. Id. at 288. Holly sought $750,000 in compensatory damages, $750,000 in punitive damages, and an injunction ordering his transfer to a federal correctional facility with competent medical staff. See Compl., Holly v. Scott, No. 03-CT-40-FL (E.D.N.C. Aug. 25, 2003).[2] The district court read Holly's complaint "as alleging a violation of his Eighth Amendment rights and stating a Bivens cause of action for damages." Holly, 434 F.3d at 288. The district court denied defendants' motion to dismiss for failure to state a claim upon which relief can be granted. Id. The Fourth Circuit permitted an interlocutory appeal and reversed, rejecting plaintiff's "public function" theory of government action. See id. at 292–94. Stated succinctly, the Fourth Circuit concluded that GEO's ownership and operation of Rivers did not convert GEO into a government actor and did not permit the private acts of GEO to be imputed to the BOP as government action. Id.

Plaintiff correctly notes that in Bivens, the Supreme Court permitted a party to sue federal officials in their individual capacity for damages for Fourth Amendment violations notwithstanding the absence of an express statutory cause of action analogous to 42 U.S.C. § 1983. See Bivens, 403 U.S. at 395–97. In 1980, the Supreme Court extended Bivens to provide a damages remedy under the Cruel and Unusual Punishments Clause of the Eighth Amendment. Carlson v. Green, 446 U.S. 14, 18–23 (1980). In contrast to Bivens and Carlson, plaintiff here seeks injunctive relief against the

---

[2]Holly apparently was released on August 9, 2005. Am. Compl. ¶ 80, Holly v. Christensen, 5:07-CT-3134-D (E.D.N.C. Oct. 5, 2007); see Fed. Bureau of Prisons, Inmate Locator, http://www.bop.gov/iloc2/LocateInmate.jsp (last visited Nov. 9, 2009).

7

BOP and GEO for alleged Eighth Amendment violations arising from his medical care. Although plaintiff contends that the remedy sought in Bivens and Carlson is significant, the Fourth Circuit has cited Bivens and Bell v. Hood, 327 U.S. 678, 684 (1946), as recognizing a federal court's equitable power, in cases arising under 28 U.S.C. § 1331, to enjoin federal officers in their official capacity from enforcing unconstitutional statutes or to direct federal officers to act to safeguard constitutional rights. See, e.g., Ross v. Meese, 818 F.2d 1132, 1135 (4th Cir. 1987); Taylor v. Cohen, 405 F.2d 277, 279–80 (4th Cir. 1968) (en banc); Phelps v. Hadden, No. 94-6421, 1994 WL 273945, at *1 (4th Cir. June 22, 1994) (per curiam) (unpublished).[3] Nonetheless, regardless of whether plaintiff seeks damages or an injunction from GEO under Bivens or Bell v. Hood, government action is required, and the Supreme Court and the Fourth Circuit have rejected the notion that GEO — a private entity operating a private prison— is a government actor who can violate the Eighth Amendment. See, e.g., Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001); Holly, 434 F.3d at 289–94.[4] Therefore, plaintiff's constitutional claim against GEO is dismissed for failure to state a claim upon which relief can be granted.

    As for plaintiff's Eighth Amendment claim against the BOP and Lappin in his official

---

    [3]For a discussion of Bivens and a federal court's equitable power to order injunctive relief against the BOP for unconstitutional medical care, see then-Judge McConnell's opinion for the Tenth Circuit in Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225 (10th Cir. 2005).

    [4]The Fourth Circuit has consistently applied Holly to foreclose constitutional claims against GEO, GEO employees, and other non-government actors. See Philips v. Pitt County Mem'l Hosp., 572 F.3d 176, 181–85 (4th Cir. 2009); McGill v. Snyder, 214 Fed. Appx. 330, 330 (4th Cir. 2007) (per curiam) (unpublished) (GEO employees); Rivas v. GEO Group, Inc., 214 Fed. Appx. 320, 320 (4th Cir. 2007) (per curiam) (unpublished) (GEO and GEO employees); Flores-Rosales v. GEO Group, Inc., 210 Fed. Appx. 271, 271 (4th Cir. 2006) (per curiam) (unpublished) (GEO and GEO employees); Lyles v. Scott, 202 Fed. Appx. 632, 632 (4th Cir. 2006) (per curiam) (unpublished) (GEO employees); Mendez v. Farmer, 197 Fed. Appx. 231, 232 (4th Cir. 2006) (per curiam) (unpublished) (GEO employees).

8

capacity based on GEO's conduct, such a derivative liability claim also requires government action. See Malesko, 534 U.S. at 66; Holly, 434 F.3d at 291–93. Moreover, the court has reviewed Malesko and Holly and rejects plaintiff's argument that his request for declaratory and injunctive relief (but not damages) takes his Eighth Amendment claim against the BOP and Lappin outside the Supreme Court's holding in Malesko or the Fourth Circuit's holding in Holly. See Malesko, 534 U.S. at 66, 73–74; Rendell-Baker v. Kohn, 457 U.S. 830, 837–43 (1982); Holly, 434 F.3d at 289–94. Likewise, the court rejects plaintiff's argument that West v. Atkins, 487 U.S. 42 (1988), "governs this case." Pl.'s Mem. 28. Holly teaches that West does not govern this case. See Holly, 434 F.3d at 293–94 (distinguishing West). Thus, plaintiff's derivative liability Eighth Amendment claim against the BOP and Lappin fails to state a claim upon which relief can be granted.

At oral argument, plaintiff clarified that he also was pursuing his Eighth Amendment claim against the BOP and Lappin under a theory of direct liability. To state an Eighth Amendment claim under such a theory, plaintiff must allege that defendant "knows of and disregards an excessive risk to inmate health or safety" and "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

The amended complaint fails to allege facts sufficient to support Calland's direct liability Eighth Amendment claim against the BOP and Lappin. Calland has arthritis, degenerative bone disease, and diabetes. Am. Compl. ¶ 11. When Calland arrived at Rivers in August 2004, he requested physical therapy, and his request was denied. Id. According to Calland, "GEO, under BOP supervision and control, assumed responsibility for the medical treatment of persons incarcerated at the Rivers facility" and the BOP "has specific responsibility for oversight and monitoring GEO's activities at Rivers, and the BOP exercises control over GEO's personnel

9

decisions, policies, and procedures." Id. ¶¶ 32, 34. Plaintiff further alleges that defendants know that he and "all other prisoners at Rivers live under conditions creating an unreasonable risk of future harm, but have not responded reasonably to this situation." Id. ¶ 68. Calland's amended complaint does not allege that the BOP or Lappin knew of and disregarded a substantial risk of serious harm to Calland's health or safety. Cf. Farmer, 511 U.S. at 837, 845–46. Accordingly, plaintiff's Eighth Amendment direct liability claim against the BOP and Lappin fails to state a claim upon which relief can be granted.

B.

Next, plaintiff argues that defendants GEO and the BOP violated the Rehabilitation Act. Section 504(a) of the Rehabilitation Act provides:

> [n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). Section 505(a) of the Rehabilitation Act describes the remedies available for a violation of section 504(a). It states: "[t]he remedies, procedures, and rights set forth in [T]itle VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [section 504]." Id. § 794a(a)(2).

Plaintiff seeks to hold the BOP and GEO liable under the Rehabilitation Act for denial of access to facilities and for improper medical treatment of his physical condition. See Am. Compl. ¶¶ 11, 50, 69–77. In making his Rehabilitation Act claim, plaintiff alleges that he is an "otherwise qualified individual with a disability" and that the BOP and GEO denied him benefits "solely by reason" of his disability. See id. ¶¶ 11, 71, 73–74. Plaintiff also argues that, under the federal

10

government procurement contract between the BOP and GEO, the BOP and GEO operate a "program or activity conducted by [an] Executive agency" within the meaning of section 504(a). See 29 U.S.C. § 794(a); Am. Compl. ¶ 72.[5]

1.

Initially, the court addresses plaintiff's Rehabilitation Act claim against the BOP. Plaintiff concedes that because the remedy provision in section 505(a) of the Rehabilitation Act does not reference a "program or activity conducted by [an] Executive agency," that his Rehabilitation Act claim against the BOP must be implied. See Pl.'s Mem. 44–47; cf. 29 U.S.C. § 794a(a)(2). Plaintiff argues, however, that this court should hold that section 504 implicitly permits a private right of action against the federal government for injunctive relief "under any program or activity conducted by any Executive agency." In support, plaintiff cites Lane v. Pena, 518 U.S. 187 (1996), and four district court cases. See Pl.'s Mem. 44–45.

In Lane, the Court held that, when Congress enacted the Rehabilitation Act, Congress had not waived the federal government's sovereign immunity against an award of money damages. See 518 U.S. at 192–200. Lane was a student at a federal service academy within the U.S. Department of Transportation who was dismissed from the academy because of his diabetes. Id. at 189. Lane sued the Department of Transportation under the Rehabilitation Act, contended that the academy was a "program or activity conducted by [an] Executive agency" under 29 U.S.C. § 794(a), and obtained both injunctive relief (in the form of an order of reinstatement) and money damages in the trial court.

_____

[5]In making his Rehabilitation Act claim against both the BOP and GEO, plaintiff expressly denies relying on the clause in 29 U.S.C. § 794(a) referencing "any program or activity receiving [f]ederal financial assistance." 29 U.S.C. § 794(a); see Pl.'s Mem. 40 n.16. The concession is wise. See, e.g., Venkatraman v. REI Sys., Inc., 417 F.3d 418, 421 (4th Cir. 2005); Tolliver v. Xerox Corp., 918 F.2d 1052, 1060 (2d Cir. 1990); DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1382–83 (10th Cir. 1990); Nolley v. County of Erie, 776 F. Supp. 715, 742–43 (W.D.N.Y. 1991).

11

See Lane, 518 U.S. at 189–90.

On appeal, the government did not dispute the propriety of granting injunctive relief, but did dispute the propriety of awarding damages against the federal government for violating section 504(a). See id. at 190. The Court held that, for a Rehabilitation Act claim, sovereign immunity barred an award of money damages against the federal government. Id. at 192–200.

According to plaintiff, four district courts have interpreted Lane to permit a person alleging a violation of section 504(a) of the Rehabilitation Act in a "program or activity conducted by [an] Executive agency" to obtain injunctive relief against the federal government. See Am. Council of Blind v. Astrue, No. C 05-04696, 2008 WL 1858928, at *7 & n.4 (N.D. Cal. Apr. 23, 2008) (unpublished) (holding that, under Ninth Circuit precedent, section 504 creates a private right of action for blind recipients of Social Security benefits suing the Social Security Administration to obtain declaratory and injunctive relief); Howard v. Bureau of Prisons, No 3:05-CV-1372, 2008 WL 318387, at *9 (M.D. Pa. Feb. 4, 2008) (unpublished) (dismissing federal inmate's claim for money damages but allowing his claim for injunctive relief to proceed against the BOP under the Rehabilitation Act); Am. Council of Blind v. Paulson, 463 F. Supp. 2d 51, 57–58 (D.D.C. 2006) (awarding a national organization for the visually impaired declaratory and injunctive relief from the Bureau of Engraving and Printing; directing it to print currency that is easily identiable for the visually impaired), aff'd, 525 F.3d 1256 (D.C. Cir. 2008); Mendez v. Gearan, 947 F. Supp. 1364, 1370–71 (N.D. Cal. 1996) (holding that, under Ninth Circuit precedent, section 504 creates a private right of action for unsuccessful applicant to obtain declaratory and injunctive relief against the Peace Corps). These district courts recognized that the Supreme Court in Lane did not expressly address the propriety of injunctive relief against the federal government, but concluded that such relief was permissible under the Rehabilitation Act. See Astrue, 2008 WL 1858928, at *7 & n.4; Howard,

2008 WL 318387, at \*9; <u>Paulson</u>, 463 F. Supp. 2d at 57–58; <u>Mendez</u>, 947 F. Supp. at 1368.

The BOP disagrees and moves to dismiss the Rehabilitation Act claim in count two. The BOP contends —and plaintiff concedes (Pl.'s Mem. 46–47) — that section 504 contains no express right of action based on a program or activity "conducted by [an] Executive agency," and that any right of action that may exist must be implied. <u>See</u> 29 U.S.C. § 794a(a)(2).[6] Further, the BOP argues that no court has found an implied right of action under section 504 of the Rehabilitation Act against a federal agency based on the actions or inactions of a government contractor performing services under a federal government procurement contract and contends that the court should not do so here. <u>See</u> Fed. Defs.' Reply Br. 10–11. In making its argument, the BOP relies on <u>Jersey Heights Neighborhood Association v. Glendening</u>, 174 F.3d 180 (4th Cir. 1999), and <u>Alexander v. Sandoval</u>, 532 U.S. 275 (2001). The BOP notes that although the cited cases involve Title VI of the Civil Rights Act of 1964, section 505(a) of the Rehabilitation Act references the remedies, procedures, and rights in Title VI. <u>See</u> 29 U.S.C. § 794a(a)(2).

In <u>Jersey Heights Neighborhood Association</u>, a group of African-American landowners brought suit against the state and federal agencies and officials responsible for siting a new highway adjacent to the landowners' neighborhood. 174 F.3d at 183. The action included a claim under Title VI against the federal defendants. The Fourth Circuit affirmed the dismissal of the Title VI claim

---

[6]Section 794a(a)(2) provides:

The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

29 U.S.C. § 794a(a)(2).

13

on the ground that the claim was barred by sovereign immunity. Id. at 191.

Like section 504 of the Rehabilitation Act, Title VI contains no express private right of action. Although the Fourth Circuit recognized the Supreme Court's decision in Cannon v. University of Chicago, 441 U.S. 677, 703 (1979), permitting an implied right of action under section 601 of Title VI against private recipients of federal funds, the Fourth Circuit held that Congress did not intend to create a private of action under section 602 of Title VI against the federal agencies providing the funds. Jersey Heights Neighborhood Ass'n, 174 F.3d at 191.

Similarly, in 2001, the Supreme Court considered whether section 602 of Title VI created a private right of action against federal agencies to enforce regulations promulgated under section 602. Alexander, 532 U.S. at 285–93. Recognizing that "[t]he judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy" and that "courts may not create [a private remedy], no matter how desirable that might be as a policy matter, or how compatible with the statute," the Court held that section 602 did not provide such a remedy. Id. at 286–87, 290–91.

Turning to plaintiff's section 504 claim against BOP, this court has relied on Jersey Heights Neighborhood Ass'n to refuse to imply a private right of action under section 504 against the federal government or its officials. See Hines v. GEO Group, Inc., No. 5:08-CT-3056-D, at *8 (E.D.N.C. Dec. 23, 2008) (unpublished). The court remains unconvinced that plaintiff's proposed implied private right of action exists against the BOP under 29 U.S.C. § 794(a)(2). See, e.g., Jersey Heights Neighborhood Ass'n, 174 F.3d at 191; see generally Alexander, 532 U.S. at 285–93.

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, bolsters the conclusion that the court should not imply plaintiff's proposed right of action under section 504 against the BOP. Notably, the APA may provide for judicial review of the BOP's alleged action and thereby

14

undercut the need to imply a private right of action against the BOP under section 504. See Clark v. Skinner, 937 F.2d 123, 124–26 (4th Cir. 1991); Cousins v. Secretary of U.S. Dep't of Transp., 880 F.2d 603, 605–12 (1st Cir. 1989) (en banc) (Breyer, J.).

In Clark, plaintiff challenged the Department of Transportation's ("DOT") waiver provisions concerning the regulation prohibiting amputees from operating commercial vehicles. 937 F.2d at 124–25. The Fourth Circuit recognized that a private cause of action may exist against a private employer or the United States in its capacity as an employer. Id. at 125. But the Fourth Circuit elected not to imply a private right of action under section 504 against the DOT when a plaintiff was essentially challenging a federal agency action. Id. Instead, the Fourth Circuit recognized that the "APA was intended to organize and unify preexisting methods of obtaining judicial review of agency action, e.g. by making it clear that anyone adversely affected or aggrieved within the meaning of a relevant statute could obtain review of agency action" and held that the APA provided the appropriate vehicle for judicial review of an action that a federal agency took. Id. at 126 (quotation omitted). In deciding Clark, the Fourth Circuit found the First Circuit's decision in Cousins persuasive. Clark, 937 F.2d at 125–26.

In Cousins, then-Judge Breyer wrote for the First Circuit sitting en banc. Cousins also involved a trucker with a disability challenging DOT regulations. 880 F.2d at 604. The First Circuit held that the APA was the proper avenue for seeking a remedy for one harmed by a federal agency action, not an implied right of action under section 504. Id. at 610–12. In reaching this conclusion, the First Circuit noted that "in light of the existence of the APA, it rarely makes sense to find that a substantive statute creates an implied private right of action against the federal government for relief from unlawful regulatory action" and that doing so "would threaten a return to pre-APA

15

confusion." Id. at 606 (quotation omitted).[7]

Alternatively, even if this court were to permit the proposed implied private right of action against the BOP, plaintiff's Rehabilitation Act claim against the BOP fails for another reason. In Logan v. United States, the Ninth Circuit affirmed summary judgment for the government. There, the BOP had contracted with a private-detention facility to provide for the "care, custody, control, accountability and treatment of federal prisoners." No. 96-55042, 1996 WL 717087, at *1 (9th Cir. Dec. 6, 1996) (per curiam) (unpublished) (quotation omitted). Logan, a paraplegic, alleged that the private-detention facility was unable to meet the needs arising from his disability. Id. The Ninth Circuit noted that "the Rehabilitation Act covers only the recipients of federal financial assistance and not the recipients of compensatory payments for services." Id. at *2; see 29 U.S.C. § 794a(a)(2). "Because [the plaintiff] did not allege that [the private-detention facility] operate[d] under federal financial assistance and the record shows the government did not subsidize [its] operation," the Rehabilitation Act claim against the United States failed. Logan, 1996 WL 717087, at *2; see also Nolley v. County of Erie, 776 F. Supp. 715, 743 (W.D.N.Y. 1991).

As in Logan, plaintiff does not allege that the BOP subsidizes GEO's operation of Rivers or that GEO receives "[f]ederal financial assistance" within the meaning of the Rehabilitation Act. Thus, plaintiff's Rehabilitation Act claim against the BOP fails to state a claim upon which relief can be granted.

2.

As for plaintiff's Rehabilitation Act claim against GEO, plaintiff again focuses on 29 U.S.C.

---

[7]At oral argument, the BOP's counsel suggested that an amendment to add an APA claim to the complaint would be futile. Plaintiff's counsel disagreed. If plaintiff amends his complaint to add a claim under the APA, the court will address the viability of plaintiff's APA claim.

§ 794(a). Plaintiff alleges that he is an "otherwise qualified individual with a disability" whom GEO has discriminated against "solely by reason of his disability." Am. Compl. ¶¶ 11, 70–71. As for the balance of his Rehabilitation Act claim against GEO, plaintiff contends that, under the government procurement contract between the BOP and GEO, GEO operates a "program or activity conducted by [an] Executive agency" for which GEO may be liable. See id. ¶ 72; cf. 29 U.S.C. § 794(a). In support, plaintiff cites Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206, 210 (1998), and Key v. Grayson, 179 F.3d 996, 997 (6th Cir. 1999).

GEO responds that its operation of Rivers does not qualify as a "program or activity conducted by [an] Executive agency" in 29 U.S.C. § 794(a). In support, GEO notes that the Rehabilitation Act defines "program or activity" in 29 U.S.C. § 794(b) to mean the operation of (1) a state or local government (29 U.S.C. § 794(b)(1)); (2) a postsecondary institution, a public system of higher education, or a local educational agency (id. § 794(b)(2)); (3) a private corporation if assistance is extended to such corporation as a whole or "which is principally engaged in the business of providing education, healthcare, housing, or social services, or parks and recreation" (id. § 794(b)(3)); or (4) a joint venture between two or more of the entities described above (id. § 794(b)(4)), any part of which is extended federal financial assistance. See id. § 794(b). GEO argues that it obviously is not a state or local government, an education agency, or a joint venture as defined in 29 U.S.C. § 794(b)(1), (b)(2), or (b)(4). As for section 794(b)(3), GEO argues that it is not "principally engaged" in the enumerated businesses in section 794(b)(3). Further, GEO cites plaintiff's concession that GEO does not receive "[f]ederal financial assistance" under the Rehabilitation Act to argue that GEO's operation of Rivers does not fall within the definition of "program or activity" in 29 U.S.C. § 794(b)(3). Accordingly, GEO contends that plaintiff has failed to state a claim against it under 29 U.S.C. § 794(a).

17

First, the court addresses plaintiff's argument. Plaintiff's citation to <u>Yeskey</u> and <u>Key</u> provide no support for permitting his Rehabilitation Act claim to proceed against GEO. In <u>Yeskey</u>, the Court analyzed whether Title II of the Americans with Disabilities Act of 1990 ("ADA") covers <u>state</u> prisons. 524 U.S. at 208. Rivers is not a state prison. Moreover, in <u>Yeskey</u>, the Court did not address whether the Rehabilitation Act applies to a private corporation that receives funds from the BOP pursuant to a federal government procurement contract to house federal inmates. Similarly, in <u>Key</u>, the Sixth Circuit analyzed a state prison inmate's claims under the ADA and the Rehabilitation Act and concluded that the ADA and the Rehabilitation Act applied to state prisons. <u>See</u> 179 F.3d at 997–99. That conclusion is consistent with <u>Yeskey</u>. It is also consistent with the definition of "public entity" in the ADA (42 U.S.C. § 12131(1)), and the definition of "program or activity" in the Rehabilitation Act where a State receives "[f]ederal financial assistance" (29 U.S.C. § 794(b)(1)(A), (B)). That conclusion, however, does not address whether GEO's operation of Rivers falls within the definition of "program or activity conducted by [an] Executive agency" under 29 U.S.C. § 794(a).[8]

Next, the court addresses GEO's contention that the definition of "program or activity" in 29 U.S.C. § 794(b) shows that GEO's operation of Rivers does not constitute a "program or activity conducted by any Executive agency" under 29 U.S.C. § 794(a). In order to address GEO's argument, the court initially focuses on the text of section 504(a) and 504(b). <u>See</u> 29 U.S.C. § 794(a), (b). The

---

[8]Unlike the state prisoner in <u>Yeskey</u>, a federal prisoner in a federal prison would not be able to state a claim against the BOP under Title II of the ADA. The ADA's definition of "public entity" in 42 U.S.C. § 12131(1) does not include the federal government. <u>See</u> 42 U.S.C. § 12131(1); <u>Cellular Phone Taskforce v. FCC</u>, 217 F.3d 72, 73 (2d Cir. 2000) (per curiam); <u>Noe v. McFadden</u>, No. 5:06-CT-3139-D, at *7–*8 (E.D.N.C. July 10, 2007) (unpublished); <u>Parks v. Lappin</u>, No. 5:06-CT-3136-D, at *1–*2 (E.D.N.C. Mar. 8, 2007) (unpublished); <u>Agee v. United States</u>, 72 Fed. Cl. 284, 289 (2006); <u>Mills v. Barreto</u>, No. 3:03-CV-735, 2004 WL 3335448, at *3 (E.D. Va. Mar. 8, 2004) (unpublished).

Case 2:08-ct-00021-D    Document 96-2    Filed 11/09/2009    Page 18 of 40

text of section 504(a) applies to "any program or activity receiving [f]ederal financial assistance or . . . any program or activity conducted by any Executive agency or by the United States Postal Service." 29 U.S.C. § 794(a). Section 504(b) then defines "program or activity" "[f]or the purposes of this section," references various state, local, or private entities, and concludes with the modifier "any part of which is extended [f]ederal financial assistance." 29 U.S.C. § 794(b). The modifier concerning "[f]ederal financial assistance" applies to those entities referenced in section 504(b). Notably, nothing in section 504(b) references Executive agencies. Further, applying section 504(b)'s definition of "program or activity" to Executive agencies would produce absurd results. For example, an Executive agency could not conduct a State government. Cf. 29 U.S.C. § 794(a), (b)(1). Thus, the court concludes that the definition of "program or activity" in 29 U.S.C. § 794(b) does not define the meaning of "program or activity conducted by [an] Executive agency" in 29 U.S.C. § 794(a).

The court's conclusion that the definition of "program or activity" in 29 U.S.C. § 794(b) does not apply to the phrase "program or activity conducted by an Executive agency" in 29 U.S.C. § 794(a) is consistent with the history of the Rehabilitation Act and its amendments. In the original version of the Rehabilitation Act, section 504 did not apply to federal Executive agencies, and section 504(b) did not exist. See Pub. L. No. 93-112, tit. V, § 504, 87 Stat. 355, 394 (1973). In 1978, Congress amended section 504 to insert the phrase "any program or activity conducted by any Executive agency or by the United States Postal Service." See Pub. L. No. 95-602, tit. IV, §§ 119, 122(d)(2), 92 Stat. 2955, 2982, 2987 (1978). The 1978 amendments also added the remedies provision known as section 505, codified at 29 U.S.C. § 794a. See Pub. L. No. 95-602, tit. IV, 92 Stat. 2955, 2982 (1978).

19

In 1988, Congress enacted the Civil Rights Restoration Act of 1987 ("Restoration Act"), which, inter alia, added section 504(b). See Pub. L. No. 100-259, § 4, 102 Stat. 28, 29 (1988); 29 U.S.C. § 794(b). Congress premised the Restoration Act upon its findings that "certain aspects of recent decisions and opinions of the Supreme Court have unduly narrowed or cast doubt upon the broad application of . . . section 504 of the Rehabilitation Act of 1973." Id. § 2, 102 Stat. at 28. The Senate Report acknowledges the Restoration Act's purpose was to "overturn the Supreme Court's 1984 decision in Grove City College v. Bell, 465 U.S. 555 (1984)," and "defin[e] the phrase 'program or activity' . . . to make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives [f]ederal financial assistance." S. REP. NO. 100-64, at 1, 4 (1988), reprinted in 1988 U.S.C.C.A.N. 3, 3–4, 6.[9] Thus, Congress inserted a definition of the phrase "program or activity" in order to address the meaning of "program or activity receiving [f]ederal financial assistance." See id. Accordingly, the court does not use the definition of "program or activity" in section 504(b) to define the phrase "program or activity conducted by any Executive agency" in section 504(a).

The court next considers whether a federal government procurement contract for services is a "program or activity conducted by any Executive agency" under section 504. Tellingly, the parties have not cited any case that interprets "program or activity conducted by any Executive agency" to mean that whenever an Executive agency enters a federal government procurement contract for services that the contract creates a "program or activity conducted by [an] Executive agency" within the meaning of 29 U.S.C. § 794(a). Cf. Katsiavelos v. Fed. Reserve Bank of Chicago, 859 F. Supp.

---

[9]Grove City College involved whether Title IX applied to a local college that did not directly receive federal financial assistance, but enrolled students who received federal grants. 465 U.S. at 558–59. Grove City College did not involve a "program or activity conducted by [an] Executive agency." 29 U.S.C. § 794(a).

1183, 1185 (N.D. Ill. 1994).[10] Likewise, the parties have not cited any case that not only adopts such an expansive view of the phrase "program or activity conduct by [an] Executive agency," but also provides a remedy under the Rehabilitation Act against the government procurement contractor (as opposed to the Executive agency). Either interpretation would dramatically expand the reach of section 504 of the Rehabilitation Act to the private sector. More than thirty years have passed since Congress added the phrase "program or activity conducted by an Executive agency" to the Rehabilitation Act. In that time, the United States has entered millions of federal government procurement contracts and paid billions of dollars to government contractors providing goods or services in accordance with such procurement contracts. If the Rehabilitation Act applies in the manner plaintiff proposes, there should be at least one case that supports his position. Yet, plaintiff cannot cite one case to support his novel argument. Moreover, Congress knew how to impose obligations on parties entering government procurement contracts and did so, in a limited way, in section 503 of the Rehabilitation Act. See 29 U.S.C. § 793(a) (any government procurement contract for personal property and nonpersonal services (including construction) over $10,000 must include a provision requiring contractors to take affirmative action to employ, and advance in employment, qualified individuals with disabilities).

Not surprisingly, the legislative histories of the Rehabilitation Act and its amendments evince no Congressional purpose to expand the reach of the Rehabilitation Act in the manner that plaintiff proposes. In 1973, Congress enacted the Rehabilitation Act. In section 504 of the Rehabilitation Act, Congress created protection against disability discrimination "under any program or activity

_____

[10]In Katsiavelos, the court held that a regional federal reserve bank was not an "Executive agency" under section 504 because it was "not controlled by the executive branch . . . [and] act[ed] with sufficient independence under private ownership and control." 859 F. Supp. at 1185.

21

receiving [f]ederal financial assistance." See Pub. L. No. 93-112, tit. V, § 504, 87 Stat. 355, 394 (1973) ("No otherwise qualified handicapped individual in the United States . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance."). Section 504 prohibited those private sector entities "receiving [f]ederal financial assistance" from excluding qualified individuals with disabilities from participating in "any program or activity" based solely on the individual's disability. Id. Thus, the touchstone for a private-sector entity to fall within section 504 of the Rehabilitation Act required the private-sector entity to be receiving "[f]ederal financial assistance." See id.; S. REP. No. 93-318, reprinted in 1973 U.S.C.C.A.N. 2076, 2143.

Further, since the Rehabilitation Act's inception, the United States has promulgated regulations stating that a private-sector entity receiving payment from the federal government in accordance with a federal government procurement contract to provide goods or services was not receiving "[f]ederal financial assistance" within the meaning of section 504 of the Rehabilitation Act. See, e.g., 45 C.F.R. § 84.3(h) (2009) (regulating Department of Health and Human Services ("DHHS")); Jacobson v. Delta Airlines, 742 F.2d 1202, 1209–10 (9th Cir. 1984). Instead, the regulations explicitly exempt "procurement contract[s]" involving Executive agencies from the definition of "[f]ederal financial assistance." See, e.g., 45 C.F.R. § 84.3(h) (2009).[11]

---

[11]DHHS's predecessor — the Department of Health, Education, and Welfare ("DHEW") — was the first agency to promulgate regulations concerning "any program or activity receiving [f]ederal financial assistance" under section 504. See 42 Fed. Reg. 22,676 (May 4, 1977). President Ford initially charged the Secretary of the DHEW with coordinating implementation of section 504 within the federal government. See Exec. Order No. 11,914, 41 Fed. Reg. 17,871 (Apr. 28, 1976). In 1978, the DHEW promulgated "procedures, standards, and guidelines . . . to be followed by each [f]ederal agency that provides [f]ederal financial assistance in issuing regulations implementing section 504." 43 Fed. Reg. 2,132 (Jan. 13, 1978). In 1980, President Carter assigned the function

In 1978, Congress extended section 504 to include programs or activities that a federal Executive agency conducts by adding the phrase "or under any program or activity conducted by any Executive agency or by the United States Postal Service" to section 504. Pub. L. No. 95-602, tit. IV, § 119, 92 Stat. 2955, 2982 (1978). Although the legislative history is thin about why Congress inserted this phrase into section 504, nothing suggests that Congress intended to include private entities providing goods or services to the federal government under a federal government procurement contract. The version of the bill reported out of the House Education and Labor Committee and the Interstate and Foreign Commerce Committee did not include the "program or activity conducted by any Executive agency" provision. See H.R. REP. NO. 95-1149 (1978),

---

of coordinating enforcement of section 504 for federally assisted programs within the executive branch to the Department of Justice ("DOJ"). See Exec. Order 12,250, 45 Fed. Reg. 72,995 (1980); cf. 46 Fed. Reg. 40,686 (Aug. 11, 1981) (redesignating DHEW regulations to DOJ). To this day, each executive agency that has promulgated regulations to implement section 504 has excluded payments received pursuant to a federal government procurement contract from the meaning of "[f]ederal financial assistance" under section 504. See, e.g., 52 Fed Reg. 25,355 (July 7, 1987) (codified as amended at 10 C.F.R. § 4.4(d)) (Nuclear Regulatory Comm'n); 51 Fed. Reg. 45,266 (Dec. 17, 1986) (codified as amended at 24 C.F.R. § 146.7) (Dep't of Hous. & Urban Dev.); 51 Fed. Reg. 26,862 (July 28, 1986) (codified as amended at 14 C.F.R. § 1251.1) (NASA); 47 Fed. Reg. 29,546 (July 7, 1982) (codified as amended at 43 C.F.R. § 17.202(h)) (Dep't of Interior); 47 Fed. Reg. 17,744 (Apr. 23, 1982) (codified as amended at 15 C.F.R. § 8.3(e), (f)) (Dep't of Commerce); 47 Fed. Reg. 15,122 (Apr. 8, 1982) (codified at 32 C.F.R. § 56.3(b)) (Dep't of Defense); 47 Fed. Reg. 8,570 (Mar. 1, 1982) (codified as amended at 45 C.F.R. § 605.3(h)) (Nat'l Sci. Found.); 46 Fed. Reg. 55,897 (Nov. 12, 1981) (codified as amended at 45 C.F.R. § 1170.3(f) (Nat'l Endowment for Humanities); 46 Fed. Reg. 55,894 (Nov. 12, 1981) (codified as amended at 45 C.F.R. § 1170.3(f)) (Nat'l Found. on Arts & Humanities); 46 Fed. Reg. 5,620 (Jan. 19, 1981) (codified at 45 C.F.R. § 1012) (Cmty. Servs. Admin.); 45 Fed. Reg. 75,568 (Nov. 14, 1980) (codified at 5 C.F.R. § 900.703(b)) (Office of Pers. Mgmt.); 45 Fed. Reg. 69,437 (Oct. 21, 1980) (codified as amended at 22 C.F.R. § 142.3)(h)) (Dep't of State); 45 Fed. Reg. 66,706 (Oct. 7, 1980) (codified as amended at 29 C.F.R. § 32.3) (Dep't of Labor); 45 Fed. Reg. 66,414 (Oct. 6, 1980) (codified as amended at 22 C.F.R. § 217.3(g)) (Agency for Int'l Dev.); 45 Fed. Reg. 63,264 (Sept. 24, 1980) (codified as amended at 38 C.F.R. § 18.403(h) (Dep't of Veterans Affairs); 45 Fed. Reg. 30,936 (May 9, 1980) (codified as amended at 34 C.F.R. § 104.3(h) (Dep't of Educ.); 44 Fed. Reg. 31,468 (May 31, 1979) (codified as amended at 49 C.F.R. § 27.5) (Dep't of Transp.); 44 Fed. Reg. 31,018 (May 30, 1979) (codified as amended at 45 C.F.R. § 1232.3(f)) (Corp. for Nat'l & Cmty. Serv.); 44 Fed. Reg. 22,734 (Apr. 17, 1979) (codified as amended at 45 C.F.R. § 1151.3(f)) (Nat'l Endowment for Arts).

reprinted in 1978 U.S.C.C.A.N. 7312; H.R. REP. No. 95-1188 (1978), reprinted in 1978 U.S.C.C.A.N. 7355. Instead, a member of the House inserted the language concerning Executive agencies in section 504 before introducing the bill in the House in May 1978. See 124 CONG. REC. 13,897 (1978).

The House version would have extended section 504 to "any program or activity conducted by any Executive agency (as defined in section 105 of title 5, United States Code)." 124 CONG. REC. 13,892 (1978). Congressman Jeffords, the purported catalyst behind the extension of section 504 to Executive agencies, stated that the provision "extends the coverage of section 504 to include any function or activity of any department or agency of the Federal Government," thus eliminating the federal government's exemption. 124 CONG. REC. 13,901 (1978); see id. at 13,902 (describing Department of Labor's Bureau of Apprenticeship and Training's failure to consider access for the handicapped in selecting an office located in Vermont). Congressman Brademas, chairman of the House Subcommittee on Select Education of the Committee on Education and Labor, summarized the provision as "extending the provisions of the antidiscrimination features of the [Rehabilitation Act of 1973] to all activities and programs of the executive branch of the Federal Government." Id. at 13,897.

The Senate version had no extension of section 504. In conference, the Senate conferees agreed to the House version, as modified, to include "any program or activity conducted by any Executive agency." H.R. REP. No. 95-1780, at 92 (1978) (Conf. Rep.), reprinted in 1978 U.S.C.C.A.N. 7375, 7403. Thus, the conference made the section 504 extension coterminous with the coverage of section 501(b).[12] Id. at 93, reprinted in 1978 U.S.C.C.A.N. at 7404. On November

_____

[12]Section 501(b), in its current form, provides:

24

6, 1978, Congress enacted the 1978 amendments. See Pub. L. No. 95-602, tit. IV, §§ 119, 122(d)(2), 92 Stat. 2955, 2982, 2987 (1978). Thus, the text and history of the Rehabilitation Act counsel against plaintiff's proposed application of section 504 of the Rehabilitation Act to GEO.

Moreover, plaintiff's proposed application of section 504 of the Rehabilitation Act to GEO also finds no support in the Rehabilitation Act's regulations. In 1984, the DOJ, like other executive agencies, promulgated regulations requiring that the Department operate its programs and activities consistent with section 504's provision extending coverage to programs or activities conducted by an Executive agency. See 49 Fed. Reg. 35,724, 35,724 (Sept. 11, 1984). The DOJ acknowledged that the regulations applied to "the activities of over 30 separate subunits in the Department, including, for example, the Federal Bureau of Investigation, the Drug Enforcement Administration, the Immigration and Naturalization Service, the Bureau of Prisons, Federal Prison Industries, and the United States Attorneys." Id. The DOJ recognized that the 1978 amendment to section 504 created a general parallelism such that "the Federal government [has] the same section 504 obligations as recipients of [f]ederal financial assistance." Id. at 35,724–25. As for what constitutes a "program or activity conducted by [an] Executive agency," the DOJ stated:

> Each department, agency, and instrumentality (including the United States Postal Service and the Postal Regulatory Commission) in the executive branch and the Smithsonian Institution shall, within one hundred and eighty days after September 26, 1973, submit to the Commission and to the Committee an affirmative action program plan for the hiring, placement, and advancement of individuals with disabilities in such department, agency, instrumentality, or Institution. Such plan shall include a description of the extent to which and methods whereby the special needs of employees who are individuals with disabilities are being met. Such plan shall be updated annually, and shall be reviewed annually and approved by the Commission, if the Commission determines, after consultation with the Committee, that such plan provides sufficient assurances, procedures and commitments to provide adequate hiring, placement, and advancement opportunities for individuals with disabilities.

29 U.S.C. § 791(b).

25

a federally conducted program or activity is, in simple terms, anything a Federal agency does. Aside from employment, there are two major categories of federally conducted programs or activities covered by this regulation: those involving general public contact as part of ongoing agency operations and those <u>directly</u> <u>administered</u> by the Department for program beneficiaries and participants. Activities in the first part include communication with the public (telephone contacts, office walk-ins, or interviews) and the public's use of the [DOJ's] facilities (cafeteria, library). Activities in the second category include programs that provide Federal services or benefits (immigration activities, operation of the Federal prison system).

49 Fed. Reg. at 35,725 (emphasis added). The regulations currently state:

No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the agency.

28 C.F.R. § 39.130(a). The regulations then state that "[t]he agency, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangement, on the bases of handicap ... [d]eny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service." <u>Id.</u> § 39.130(b)(1)(i). The regulations also state that "[t]he agency, in the selection of procurement contractors, may not use criteria that subject qualified handicapped persons to discrimination on the basis of handicap." <u>Id.</u> § 39.130(b)(5). Finally, the regulations state:

The agency may not administer a licensing or certification program in a manner that subjects qualified handicapped persons to discrimination on the basis of handicap, nor may the agency establish requirements for the programs or activities of licensees or certified entities that subject qualified handicapped persons to discrimination on the basis of handicap. However, the programs or activities of entities that are licensed or certified by the agency are not, themselves, covered by this part.

<u>Id.</u> § 39.130(b)(6).

These regulations demonstrate that the phrase "program or activity conducted by any Executive agency" does not reach GEO's operation of Rivers pursuant to a federal government procurement contract. Rivers is not a program or activity involving general public contact as part

26

of ongoing BOP operations or a program or activity directly administered by the BOP for program beneficiaries and participants. See 49 Fed. Reg. at 35,725; cf. Cal. Ass'n of the Physically Handicapped, Inc. v. FCC, 840 F.2d. 88, 91–96 (D.C. Cir. 1988). Further, Congress already had specified those private entities subject to section 504 of the Rehabilitation Act and limited section 504's reach to those private entities "receiving [f]ederal financial assistance." 29 U.S.C. § 794(a).

In addition, plaintiff's interpretation of the phrase "program or activity conducted by any Executive agency" to reach GEO would contradict the regulations implementing 29 U.S.C. § 794 for programs or activities receiving federal financial assistance, which exclude federal government procurement contracts from the definition of "[f]ederal financial assistance." See, e.g., 28 C.F.R. § 41.3(e) (DOJ); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 421 (4th Cir. 2005); Logan, 1996 WL 717087, at *2; Tolliver v. Xerox Corp., 918 F.2d 1052, 1060 (2d Cir. 1990); DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1382–83 (10th Cir. 1990); Leskinen v. Utz Quality Foods, Inc., 30 F. Supp. 2d 530, 533–34 (D. Md.), aff'd, 165 F.3d 911 (4th Cir. 1998) (per curiam) (unpublished). Of course, in construing the Rehabilitation Act, its implementing regulations illuminate the Act. See McCullough v. Branch Banking & Trust Co., 844 F. Supp. 258, 259 n.4 (E.D.N.C. 1993), aff'd, 35 F.3d 127 (4th Cir. 1994). Although the cited regulations address the phrase "[f]ederal financial assistance" in 29 U.S.C. § 794(a), the court nonetheless finds the exception for federal government procurement contracts to be significant. It makes no sense to exclude federal government procurement contracts for goods or services from section 504's definition of "[f]ederal financial assistance" only to turn around and permit payments under such a federal government procurement contract to convert all private contractors that receive payment in accordance with such a contract into an "Executive agency" conducting a "program or activity." After all, Congress defined those private-sector entities subject to the Rehabilitation Act in 29 U.S.C.

27

§ 794(a) and § 794(b)(2), (b)(3), and (b)(4), and made the touchstone for private-sector coverage the receipt of "[f]ederal financial assistance." In this case, however, plaintiff does not claim that GEO receives "[f]ederal financial assistance" as defined in the Rehabilitation Act or its implementing regulations. See Pl.'s Mem. 40 n.16.

After considering the text, structure, and history of the Rehabilitation Act and considering its implementing regulations, the court concludes that GEO's operation of Rivers is not a "program or activity conducted by [an] Executive agency" under section 504. Thus, plaintiff's Rehabilitation Act claim against GEO fails to state a claim upon which relief can be granted.

3.

Alternatively, to the extent plaintiff's Rehabilitation Act claim against either the BOP or GEO relies on his allegations of inadequate medical care, plaintiff may not receive relief under the Rehabilitation Act for inadequate medical care. See, e.g., Fitzgerald v. Corrs. Corp. of Am., 403 F.3d 1134, 1144 (10th Cir. 2005); Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996). Rather, the Rehabilitation Act "afford[s] disabled persons legal rights regarding access to programs and activities enjoyed by all, not a general federal cause of action for challenging the medical treatment of their underlying disabilities." Moore v. Prison Health Servs., Inc., No. 98-3310, 1999 WL 1079848, at *1 (10th Cir. Dec. 1, 1999) (unpublished). An inmate may not "confuse[] his desire for better disability accommodations with the kind of claim for purposeful discrimination that the Rehabilitation Act prohibits." Burkett v. Booker, No. 06-CV-161-KSF, 2006 WL 2583371, at *3 (E.D. Ky. Sept. 7, 2006) (unpublished). Thus, in the alternative, the court dismisses count two for failure to state a claim upon which relief can be granted to the extent that plaintiff seeks relief from the BOP or GEO for inadequate medical care (including medical negligence or the denial of physical therapy).

28

C.

In count three, plaintiff alleges that GEO negligently failed to provide reasonable medical care and treatment to him. See Am. Compl. ¶¶ 78–81. Because the injury from this alleged tort occurred in North Carolina, North Carolina substantive law applies. See, e.g., Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 854 (1988).[13] In moving to dismiss count three, GEO contends that plaintiff's negligence claim is really a claim for medical malpractice under North Carolina law and requires a certification pursuant to Rule 9(j) of the North Carolina Rules of Civil Procedure. See Def. GEO's Mem. 20–24. In response, plaintiff concedes that he did not comply with Rule 9(j), but contends that Rule 9(j) does not apply because he does not seek damages and because this is not a medical malpractice claim. See Pl.'s Mem. 52–53; Am. Compl. ¶¶ 78–81; see also Am. Compl. 40–41. GEO replies that Rule 9(j) applies even if a plaintiff seeks only injunctive relief and that count three is a medical malpractice claim. Def. GEO's Reply Br. 5.

North Carolina state law determines the substantive elements of plaintiff's negligence claim. See, e.g., Fitzgerald v. Manning, 679 F.2d 341, 346 (4th Cir. 1982); Estate of Williams-Moore v. Alliance One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 649 (M.D.N.C. 2004); Frazier v. Angel Med. Ctr., 308 F. Supp. 2d 671, 676 (W.D.N.C. 2004). Rule 9(j) states in relevant part:

Any complaint alleging medical malpractice by a health care provider as defined in [N.C. Gen. Stat. §] 90-21.11 in failing to comply with the applicable standard of care under [N.C. Gen. Stat. §] 90-21.12 shall be dismissed unless:

(1) The pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;

---

[13]The court has jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a).

(2) The pleading specifically asserts that the medical care has been reviewed by a person that the complainant will seek to have qualified as an expert witness by motion under Rule 702(e) of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care, and the motion is filed with the complaint; or

(3) The pleading alleges facts establishing negligence under the existing common-law doctrine of res ipsa loquitur.

N.C. R. CIV. P. 9(j).

Rule 9(j) references section 90-21.11 and section 90-21.12. See N.C. R. CIV. P. 9(j). The reference in Rule 9(j) to section 90-21.11 defines the term "health care provider" under North Carolina law.[14] The reference in Rule 9(j) to section 90-21.12 defines the "applicable standard of care."[15] In support of his argument that Rule 9(j) does not apply, plaintiff cites the definition of

---

[14]N.C. Gen. Stat. § 90-21.11 states:

As used in this Article, the term "health care provider" means without limitation any person who pursuant to the provisions of Chapter 90 of the General Statutes is licensed, or is otherwise registered or certified to engage in the practice of or otherwise performs duties associated with any of the following: medicine, surgery, dentistry, pharmacy, optometry, midwifery, osteopathy, podiatry, chiropractic, radiology, nursing, physiotherapy, pathology, anesthesiology, anesthesia, laboratory analysis, rendering assistance to a physician, dental hygiene, psychiatry, psychology; or a hospital or a nursing home; or any other person who is legally responsible for the negligence of such person, hospital or nursing home; or any other person acting at the direction or under the supervision of any of the foregoing persons, hospital, or nursing home.

As used in this Article, the term "medical malpractice action" means a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider.

N.C. Gen. Stat. § 90-21.11 (2009) (emphasis added).

[15]N.C. Gen. Stat. § 90-21.12 states:

In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental,

"medical malpractice action" in section 90-21.11 and notes that the definition mentions "a civil action for damages." N.C. Gen. Stat. § 90-21.11 (2009). He also cites the first clause in section 90-21.12, which mentions an "action for damages." N.C. Gen. Stat. § 90-21.12 (2009). Because plaintiff seeks only declaratory and injunctive relief, he contends that Rule 9(j)'s cross-references to sections 90-21.11 and 90-21.12 mean that Rule 9(j) does not apply.

GEO responds that Rule 9(j) does not use the phrase "medical malpractice action." Further, GEO contends that the cross-references in Rule 9(j) to sections 90-21.11 and 90-21.12 do not incorporate the definition of the term "medical malpractice action," or any requirement that an action seek damages. In support, GEO cites the grammatical "rule of the last antecedent." See, e.g., Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 343 (2005); Barnhart v. Thomas, 540 U.S. 20, 26 (2003).

No North Carolina appellate court has addressed whether Rule 9(j) applies where a person seeks only declaratory and injunctive relief concerning alleged medical malpractice. Accordingly, this court must determine how the North Carolina Supreme Court would rule if presented the issue. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005).

In North Carolina, "[w]hen the language of a statute is clear and without ambiguity," a court must "give effect to the plain meaning of the statute." N.C. Dep't of Corr. v. N.C. Med. Bd., 363

---

or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

N.C. Gen. Stat. § 90-21.12 (2009).

N.C. 189, 201, 675 S.E.2d 641, 649 (2009) (quotation omitted). The North Carolina Supreme Court will consider legislative intent when the statutory language is ambiguous. Id., 675 S.E.2d at 649. "Legislative intent is determined by examining the statute as a whole including the spirit of the act and the objectives the statute seeks to accomplish." Thigpen v. Ngo, 355 N.C. 198, 203, 558 S.E.2d 162, 166 (2002).[16]

Nothing in the text of Rule 9(j) limits its application to an action for damages. Rule 9(j) applies to "[a]ny complaint alleging medical malpractice." N.C. R. CIV. P. 9(j). Rule 9(j) does not refer to the definition of "medical malpractice action" in section 90-21.11. Rule 9(j)'s cross-reference to section 90-21.11 only relates to the definition of the term "health care provider." Similarly, the cross-reference to section 90-21.12 only relates to the definition of the applicable standard of care. Thus, the plain language of Rule 9(j) does not restrict Rule 9(j)'s applicability to a medical malpractice claim for damages.

To the extent there is any ambiguity in Rule 9(j), the court's interpretation of Rule 9(j) is consistent with the legislative purpose behind Rule 9(j). The North Carolina General Assembly enacted Rule 9(j) in 1995 "in part, to protect defendants from having to defend frivolous medical malpractice actions by ensuring that before a complaint for medical malpractice is filed, a competent medical professional has reviewed the conduct of the defendants and concluded that the conduct did not meet the applicable standard of care." Estate of Waters v. Jarman, 144 N.C. App. 98, 100, 547 S.E.2d 142, 144 (2001) (quotation omitted); see Thigpen, 355 N.C. at 203, 558 S.E.2d at 166. In light of this purpose, the court concludes that the North Carolina Supreme Court would interpret Rule 9(j) to apply even where a plaintiff seeks only injunctive and declaratory relief for medical

---

[16]North Carolina's canon of statutory construction is consistent with the federal canon. See, e.g., Ayes v. U.S. Dep't of Veterans Affairs, 473 F.3d 104, 108 (4th Cir. 2006).

malpractice from a "health care provider" as defined in section 90-21.11. After all, even though the vast majority of medical malpractice claims involve a person seeking damages, the General Assembly's concern with reducing frivolous lawsuits warrants applying Rule 9(j) to those claims where a person seeks only injunctive or declaratory relief because of alleged medical malpractice.

As for plaintiff's argument that he seeks to recover for GEO's "negligence," but not medical malpractice, plaintiff's label does not determine whether a Rule 9(j) certification is required. See, e.g., Jarman, 144 N.C. App. at 103, 547 S.E.2d at 145. Rather, a court must examine whether a plaintiff seeks relief from a "health care provider" due to any injury arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other healthcare. See id., 547 S.E.2d at 145; Frazier, 308 F. Supp. 2d at 678.

GEO is a "health care provider" as defined in section 90-20.11 because plaintiff seeks to hold GEO liable for alleged negligence in rendering or failing to render medical services requiring special skills. See N.C. Gen. Stat. § 90-20.11; cf. Am. Compl. ¶¶ 11, 78–81. Moreover, the amended complaint details the alleged injuries that the alleged patient care decisions of GEO's medical staff caused plaintiff. See, e.g., Am. Compl. ¶¶ 11, 17–24. These decisions involved rendering or failing to render professional services requiring special skills. See id. As such, plaintiff's negligence claim "sounds in malpractice, not ordinary negligence." Frazier, 308 F. Supp. 2d at 678; see, e.g., Duke Univ. v. St. Paul Fire & Marine Ins. Co., 96 N.C. App. 635, 640–41, 386 S.E.2d 762, 766 (1990)("[N]egligence actions against health care providers may be based upon breaches of the ordinary duty of reasonable care where the alleged breach does not involve rendering or failing to render professional services requiring special skills."). Accordingly, the Rule 9(j) certification is required, and the court dismisses without prejudice plaintiff's negligence claim in count three against GEO.

33

D.

Next, GEO moves to dismiss the third-party beneficiary claim in count four, in which plaintiff seeks relief from GEO for breach of contract under a third-party beneficiary theory. See Am. Compl. ¶¶ 82–87. Plaintiff contends that "GEO and the BOP entered into the Rivers contract with the intention of conferring a direct benefit on the Plaintiffs, the Class, and the Sub-Class, namely, the provision of adequate medical, dental, and mental health care." Id. ¶ 83. According to plaintiff, GEO has breached and continues to breach its "contractual obligations to the Plaintiffs, Class, and Sub-Class by failing to provide adequate health care." Id. ¶ 84. Further, GEO's alleged breach of contract has harmed the "Plaintiffs, Class, and Sub-Class" and warrants "injunctive relief requiring GEO to perform its obligations to provide adequate health care under the Rivers Contract." Id. ¶¶ 85–87.[17]

Because the federal government is a party to the contract, federal common law controls the interpretation of the contract. See, e.g., United States v. Seckinger, 397 U.S. 203, 209–10 (1970);

---

[17]The court has jurisdiction over this claim pursuant to 28 U.S.C. § 1367(a). Thus, the court need not address whether it has jurisdiction over this claim pursuant to 28 U.S.C. § 1331. Compare Smith v. Corr. Corp. of Am., 19 Fed. Appx. 318, 320 (6th Cir. 2001) (per curiam) (unpublished) (federal court lacked subject-matter jurisdiction over third-party beneficiary breach of contract claim of D.C. prisoner arising from contract between private corporation and District of Columbia to house D.C. prisoners in Ohio facility; "to the extent that Smith had any third-party beneficiary interest at stake, he relied on the contract [between Corrections Corporation of America and the District of Columbia] rather than the Constitution or any federal law, and therefore no federal question was presented under 28 U.S.C. § 1331."), with Owens v. Haas, 601 F.2d 1242, 1248 (2d Cir. 1979) (holding that "[w]hile the matter is not free from doubt, . . . the contract [between the BOP and Nassau County, New York] sufficiently implicates federal interests so that interpretation of rights and duties under the agreement should be governed by federal law" and, therefore, provides a basis for jurisdiction in the federal courts under 28 U.S.C. § 1331); cf. Phillips v. Fed. Bureau of Prisons, 271 F. Supp. 2d 97, 102 (D.D.C. 2003) (recognizing circuit spilt on jurisdictional issue under 28 U.S.C. § 1331 regarding federal common-law contract claim).

34

Funeral Fin. Sys. v. United States, 234 F.3d 1015, 1018 (7th Cir. 2000). Moreover, nothing in the record indicates the presence of a provision in the contract opting for a different choice of law.

Turning to GEO's motion to dismiss count four, plaintiff bears an "exceptional" burden to prove that he (a nonsignatory to the federal government contract) is entitled to recover for breach of the government contract between the BOP and GEO under a third-party beneficiary theory. See, e.g., German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912); Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 706 (4th Cir. 2007). "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects the intention to benefit the party directly." Flexfab L.L.C. v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (quotation omitted).

Given that the United States enters thousands of government contracts per year totaling more than a billion dollars, third-party beneficiary status is particularly difficult to prove in connection with a federal government contract. See, e.g., Trimble Navigation Ltd., 484 F.3d at 706; Flexfab L.L.C., 424 F.3d at 1260–63; Anderson v. United States, 344 F.3d 1343, 1352 (Fed. Cir. 2003). "[F]or third–party beneficiary status to lie, the contracting officer must be put on notice, by either the contract language or the attendant circumstances, of the relationship between prime contractor and the third-party . . . so that an intent to benefit the third party is fairly attributable to the contracting officer." Flexfab L.L.C., 424 F.3d at 1263; see Alpine County v. United States, 417 F.3d 1366, 1368–69 (Fed. Cir. 2005).

The Fourth Circuit has cited cases from the United States Court of Appeals for the Federal Circuit in analyzing third-party beneficiary claims arising under federal government contracts. See Trimble Navigation Ltd., 484 F.3d at 706 (citing Flexfab, L.L.C., 424 F.3d at 1259; Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001); Montana v. United States, 124 F.3d 1269, 1273

35

(Fed. Cir. 1997)). Moreover, numerous cases from the Federal Circuit illustrate the stringent requirements that a purported third-party beneficiary to a federal government contract must show to establish such status. For example, in Anderson, the Federal Circuit rejected the notion that trust beneficiaries who held shares in a corporation that entered a federal government contract were third-party beneficiaries to the contract between the corporation and the United States. Anderson, 344 F.3d at 1351–52; accord FDIC v. United States, 342 F.3d 1313, 1319–20 (Fed. Cir. 2003) (holding that shareholders in a corporation that holds a government contract generally lack status to sue as third-party beneficiaries because the contract was not intended to benefit the shareholders personally, independently of his or her status as a shareholder); Glass v. United States, 258 F.3d 1349, 1353–54 (Fed. Cir. 2001) (same). Similarly, in Chancellor Manor v. United States, 331 F.3d 891 (Fed. Cir. 2003), owners of a low-income real estate housing projects sued the United States and alleged that they were third-party beneficiaries of a loan agreement between the U.S. Department of Housing and Urban Development ("HUD") and the owners' lenders. Id. at 901. The Federal Circuit rejected the argument, noted that none of the agreements between HUD and the lenders contained any explicit evidence showing that HUD or the lenders intended to benefit the owners directly, and found that the direct beneficiary to the contract was the public. 331 F.3d at 901. Likewise, the Federal Circuit has uniformly rejected the notion that employees of a government contractor are third-party beneficiaries to the contract between their employer and the United States. See, e.g., Christos v. United States, 300 F.3d 1381, 1384–85 (Fed. Cir. 2002). Finally, although the Fourth Circuit has not often addressed claims of third-party beneficiary status under federal government contracts, it too has taken a stringent approach to recognizing such status. See Trimble Navigation Ltd., 484 F.3d at 709.

The Fourth Circuit has instructed that, when analyzing third-party beneficiary status under

federal government contracts, courts must examine the contract itself and the circumstances surrounding its execution. Id. at 706. If a contract implements a statutory enactment, a court also may inquire into the governing statute. See id.

In this case, the court first examines the federal government procurement contract between the BOP and GEO. Plaintiff attached the contract to the amended complaint. See Am. Compl. ¶ 30, Ex. A. The contract recognizes:

> The National Capital Revitalization and Self-Government Improvement Act of 1997 mandates that the Bureau of Prisons house a portion of the District of Columbia sentenced felon population in private contract facilities. The Bureau of Prisons has proceeded to comply with the mandate by identifying the appropriate populations to fulfill the requirement from the overall District of Columbia sentenced felon population. The attached [statement of work] identifies the technical and programmatic details for a low security adult male population.

Ex. A., at 10. As mentioned, a primary goal of the Revitalization Act was to close the District of Columbia's Lorton Correctional Complex. See Pub. L. No. 105-33, § 11201, 111 Stat. 712, 734 (1997). In effecting that goal, Congress directed the BOP (instead of the District of Columbia) to designate D.C. felony offenders "to a penal or correctional facility operated or contracted for by the [BOP]." D.C. Code § 24-101(a) (2009). Congress also directed that, by September 30, 2003, "[a]t least 50 percent of the District of Columbia sentenced felony population" be housed in "private contract facilities." Id. § 24-101(c)(1)(B). Congress mandated private contract facilities to reduce costs. See S. REP. NO. 106-409, at 20 (2000).

The contract's statement of work ("SOW") lists numerous objectives including:

> The contractor shall ensure that the institution is operated in a manner consistent with the mission of the BOP. It is the mission of the BOP to protect society by confining offenders in the controlled environments of prison and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

37

Am. Compl., Ex. A, at 14. The SOW states that "[a]ll services and programs" that GEO provides at Rivers "shall comply with the SOW; the U.S. Constitution; all applicable [f]ederal, state and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law, consent decrees, and courts orders." Id. at 15. The SOW also lists numerous requirements concerning personnel that the contractor hires, see id. at 19–27, and directs that the physical plant at Rivers must comply with the Architectural Barriers Act of 1968 and the Rehabilitation Act of 1973 as amended. See id. at 32. The SOW lists security requirements (id. at 34–38), safety and emergency requirements (id. at 38–39), and discipline requirements (id. at 39). As for "inmate rights," the SOW states in full:

> The contractor shall stock and provide inmates with BOP administrative remedy forms to accommodate any claims directly related to BOP matters (e.g. sentence computation; designation and transfers issues; prior custody).
>
> The contractor shall ensure religious services program standards as established by the Religious Freedom Restoration Act are maintained.

Id. at 39.

Regarding "Health/Mental Health Care," the SOW states that "[t]he contractor shall provide all essential health services while meeting the applicable standards and levels of quality established by the ACA and the designated BOP ambulatory health care accreditation provider, JCAHO." Id. at 41.[18] The SOW then lists various accreditations that the contractor is to receive from JCAHO. Id. at 42–43. The SOW also lists requirements concerning education (id. at 46–47), recreation activities (id. at 47), and telephone service for inmates. Id. at 47–48.

The SOW discusses third-party liability and states: "[i]n awarding the contract, the Government does not assume any liability to third parties, nor will the Government reimburse the

---

[18]JCAHO stands for Joint Commission on Accreditation of Healthcare Organizations.

contractor for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the contract or any subcontract under this contract." Id. at 17. The SOW also makes clear that the contractor's performance is subject to government inspection and review. [D.E. 50-3 at 20 of 87]. However, "only the [government contracting officer] may take formal action against the contractor for unsatisfactory performance." Id. (emphasis added).

In this case, plaintiff claims that he is a third-party beneficiary of the contract between the United States and GEO, and ought to be able to enforce the inmate healthcare provisions in the contract and obtain "injunctive relief requiring GEO to perform its obligations to provide adequate health care under the Rivers Contract." Am. Compl. ¶ 87. The contract language, however, belies plaintiff's assertion that he is not only to benefit from the inmate healthcare provisions in the contract, but to benefit directly. See Flexfab, L.L.C., 424 F.3d at 1259; Anderson, 344 F.3d at 1352; FDIC, 342 F.3d at 1319–20; Chancellor Manor, 331 F.3d at 901; Castle, 301 F.3d at 1338; Glass, 258 F.3d at 1353–54. At most, plaintiff is an indirect beneficiary of the healthcare provisions in the contract. Further, the contract language disclaiming government liability to third parties and making the government contracting officer the only party that may take formal action against the contractor for unsatisfactory performance under the contract reflects the parties' intent to not confer third-party beneficiary status on the inmates. This holding is consistent with numerous cases declining to confer third-party beneficiary status on inmates housed in private contract facilities. See, e.g, Malone v. Corr. Corp. of Am., 553 F.3d 540, 543 (7th Cir. 2009); Ponchik v. King, 957 F.2d 608, 609 (8th Cir. 1992) (per curiam); Gartin v. Corr. Corp. of Am., No. 3:09-CV-00117, 2009 WL 2486133, at *2 (D. Alaska Aug. 12, 2009) (unpublished); Brown v. Sadowski, No. 08-4489, 2009 WL 2182604, at *5 n.3 (D.N.J. July 20, 2009); Lewis v. Blackburn, No. 08-CV-795-DRH, 2009 WL 1851096, at *2

39

(S.D. Ill. June 26, 2009) (unpublished); Moore v. Gaither, 767 A.2d 278, 287–88 (D.C. 2001).

Finally, the court has reviewed the National Capital Revitalization and Self-Government Improvement Act of 1997. See Pub. L. No. 105-33, § 11000, 111 Stat. 712 (1997). Nothing in that Act evinces an intent to confer third-party beneficiary status on plaintiff under the theory set forth in the amended complaint. Accordingly, the court concludes that plaintiff has failed to state a claim upon which relief can be granted in count four against GEO. See, e.g, Trimble Navigation Ltd., 484 F.3d at 709.[19]

## IV.

For the reasons stated above, the BOP's and Lappin's motion to dismiss [D.E. 64] is GRANTED, and GEO's motion to dismiss [D.E. 65] is GRANTED. Further, in accordance with the request in plaintiff's brief in opposition to the motions to dismiss, the court grants plaintiff's request for leave to amend the claims found to be deficient. Plaintiff shall file his second amended complaint not later than December 9, 2009.

SO ORDERED. This _9_ day of November 2009.

JAMES C. DEVER III
United States District Judge

---

[19]In light of this disposition, the court need not address GEO's argument that plaintiff also has to establish an explicit right in the plaintiff to enforce the contract's terms. See Montana, 124 F.3d at 1273 n.6; cf. Nguyen v. U.S. Catholic Conference, 719 F.2d 52, 55–56 (3d Cir. 1983) (affirming district court dismissal of third-party breach of contract claim because plaintiffs "point[ed] to no provision of the grant agreements that reflects the notion that [the defendant] will be liable to the refugees should it fail to perform"); Jama v. U.S. Immigration & Naturalization Serv., 334 F. Supp. 2d 662, 675–76, 688 (D.N.J. 2004) (holding that undocumented aliens held at privately run facility could not bring a third-party breach of contract action against the government contractor because the government contract between the INS and the contractor did not include a provision permitting detainees to bring a breach of contract action against the government contractor). The court also need not address GEO's arguments concerning the statute of limitations applicable to counts one through four. See GEO Mem. 24–26.

40