Declaration of Matthew D. Nace

# EXHIBIT A

Contract Facility Quality Assurance Plan, Q7700.07 (April 29, 2010)



U.S. Department of Justice
Federal Bureau of Prisons

# Contract Facility Quality Assurance Plan

| | |
|---|---|
| **OPI:** | CPD/PMB |
| **NUMBER:** | Q7700.07 |
| **LEVEL:** | Correctional Contract Facilities |
| **DATE:** | 4/29/2010 |

1. **PURPOSE AND SCOPE.** To issue a revised Quality Assurance Plan (QAP) for assessing contract compliance in secure adult correctional contract facilities. This plan was developed during an October 2009 management assessment. This plan is being disseminated for use by the Contract Facility Monitoring (CFM) Section of the Program Review Division when conducting monitorings of secure adult correctional contract facilities.

2. **DIRECTIVES AFFECTED**

   a. **Guidelines Rescinded**

   Q7700.06  Correctional Contract Facilities (12/2/08)

   b.  Directives Referenced

   Contract Performance Requirements Summary Table
   Contract Statement of Work (SOW)

3. **VITAL FUNCTIONS.** The vital functions are specified in the contract Performance Requirements Summary Table and are also referenced, where applicable, under each component of this QAP.

4. **EVALUATION TECHNIQUES FOR QUALITY ASSURANCE OF CONTRACTOR PERFORMANCE.** The Bureau has chosen to apply a program review inspection process in administering the QAP to assess the contractor's performance. Following is a description of the program review inspection process.

Program review is a system for inspecting performance, testing the adequacy of internal quality controls, and assessing risks for all program and administrative areas of contract performance.

The review guidelines contained in the QAP are derived from the SOW, professional guidelines referenced by the SOW, applicable laws and regulations, BOP policy, and any other appropriate measures within the contract's scope of work. The QAP is divided into various components, each of which contain one or more vital functions. Compliance with a vital function is essential to successful performance of the related component.

Monitorings using the QAP will be conducted on a regular basis as determined by the BOP Review Authority. Commitments for performance, as described in the contractor's technical proposal, will also be reviewed.

The Monitor-in-Charge (MIC) has the authority to exceed sampling sizes referenced in the guideline steps when deemed necessary to ensure conclusions are supported by sufficient evidence.

The BOP reserves the right to develop and implement new inspection techniques and instructions at any time during contract performance without notice to the contractor.

5.  REVIEW PROCEDURES.  Unless otherwise indicated, review step time frames will be from the last monitoring.


   /s/                          /s/
William Dalius, Jr.          D. Scott Dodrill
Assistant Director           Assistant Director
Administration Division      Correctional Programs Division


   /s/
VaNessa P. Adams
Assistant Director
Program Review Division

**1.0   INFORMATION SYSTEMS AND SECURITY**

**Vital Function:**

**VF #10**   Appropriate operational and security requirements applicable to all computer and information systems are maintained.

**1.1   Information Security**

1.1.1   Randomly select 10 percent of regular Local Area Network (LAN) users to determine the following:

    a.   Accounts have a minimum 12-character password.

    b.   A unique password option is enabled.

    c.   Accounts are set to lock following 3 invalid passwords.

    d.   Account passwords are set to expire at a maximum of 60 days.

    e.   Accounts have no more than 3 simultaneous connections.

    f.   Accounts have no more than 1 grace login.

    g.   Accounts do not have supervisory or access control trustee rights in the root of any directory.

    h.   Accounts are set to be forced out once within a 24-hour period.

1.1.2   Review the current SENTRY Prof List; LAN ID roster; and institution staff roster to determine if LAN and Sentry IDs are removed for all staff that have departed.

1.1.3   Examine 10 workstations connected to the BOP network and interview staff assigned to the selected workstations to determine if:

    a.   Virus software is installed and definition files are current.

    b.   No modems are attached.

    c.   Workstations are scanned daily and real-time anti-virus protection is enabled.

    d.   Staff are familiar with required procedures concerning the protection and storage of sensitive data (electronic and paper copy).

    e.   Output devices are secured from unauthorized viewing or access.

    f.   Workstations are secured when unattended.

    g.   Security banner displays at startup.

    h.   Protection is loaded when devices are turned on.

1.1.4    Examine the file server connected to the BOP network to determine if:

    a.   Virus scanning is done daily and real-time anti-virus scanning is enabled.

    b.   Virus software and definition files are installed and current.

    c.   Protection is loaded when devices are turned on.

1.1.5    Examine all inmate access computers to determine:

    a.   Computers have "inmate access" blue labels.

    b.   Virus software is installed and definition files are current.

    c.   Inmates do not have access to sensitive information.

    d.   Removable media is controlled by staff.

    e.   Inmate access printers are controlled by staff.

    f.   Inmate computers have no external connections to modems.

1.1.6    Interview the CSM/ISO and review a random sample (10 percent, not more than 25) of supporting documentation

(e.g., training records and sign-in sheets) to determine if all contract staff authorized to access sensitive information have received initial and annual Information Security Training.

1.1.7   Review the current institution contingency plans to determine if all operationally critical and sensitive systems have been identified and:

a.   Contingency plans and tests have been reviewed and approved by the CEO.

b.   Contingency plans have been tested.

c.   Results of test(s) have been documented.

d.   If modifications were needed as a result of testing, action plans were developed.

1.1.8   Examine network back-ups to determine:

a.   Back-ups are scheduled and performed daily.

b.   At a minimum at least one full back-up is performed weekly.

c.   All back-ups stored on-site are stored in a fire-rated media container

d.   Back-ups are labeled as sensitive.

e.   Four weekly back-ups and 12 monthly back-ups are maintained.

f.   One back-up is restorable for data integrity.

## 2.0  CORRECTIONAL PROGRAMS (Unit Management)

**Vital Functions:**

**VF #2**   Inmates are appropriately classified and managed commensurate with security and custody requirements to promote institution and public safety.

**VF #3**   Staff evaluate the needs of inmates and manage their program participation.

**VF #4**      Staff are accessible and communicate effectively with inmates to promote positive institutional adjustment.

**VF #5**      A program for inmate grievances exists that provides for the expression and resolution of inmate problems.

## 2.1   Intake Screening

2.1.1      Directly observe three intake screenings or, when observation is not feasible, review local policy and interview three staff members required to screen inmates to determine if:

   a.    All available CIM information is cross-referenced with SENTRY to verify separatees are not housed in the same institution.

   b.    A social interview is provided by staff before placement in general population.

   c.    An assessment of the inmate's general physical appearance and emotional condition is made before placement in general population.

2.1.2      During inmate screening, review all documentation to determine if the inmate has a history of sexually aggressive behavior or has recently been the victim of sexual assault.  If applicable, verify that the interviewer immediately forwarded a copy of the inmate screening form and related comments to Psychology Services.

## 2.2   Central Inmate Monitoring

2.2.1      Conduct three telephone calls (one per shift) to determine if the contractor is in compliance with the Information Services Chapter of the CIM Manual.

2.2.2      Review documentation of staff screening the telephone calls in step 2.2.1 to determine if locator center/ screening site training has been received before assuming their post.

2.2.3      Randomly select 10 locally generated CIM cases to determine the following:

a.  Corresponding entries in the CIM coordinator's tracking system verify pending CIM cases are monitored for completion.

b.  The BP-340 was generated within 30 days of the CIM classification.

c.  The CIM packet is complete, accurate, and filed in the FOI Section of the central file.

2.2.4   Review 10 CIM cases that required any type of clearance for movement to determine if proper authorization was obtained and documented on the CMC Clearance and Separated Data (PP10).

2.2.5   Review training records of all staff requiring CIM certifications to determine if all required staff are certified, and staff certifications did not expire prior to recertification.

## 2.3  Initial Classification/Inmate Program Reviews

2.3.1   Randomly select and review a minimum of 20 inmate central files to determine if:

a.  Apparent program needs of the inmates are identified on program review reports, stated in measurable terms, and reviewed at subsequent program reviews.

b.  The Judgment & Commitment Orders are reviewed to determine if any judicial recommendations were made; if so, verify that they were addressed on the team sheets.

c.  Initial classifications and program reviews are conducted on all inmates within required time frames.

d.  The Custody Classification Form (BP-338) is current and accurately reflects the application of the Public Safety Factor (PSF), Management Variable(s)(MGTV), if applicable, and custody classification.

    e.    SENTRY transactions related to program reviews (including initial classification) of inmates are kept current.

## 2.4 Inmate Financial Responsibility Program (IFRP)/Performance Pay

2.4.1    Review 10 inmate pay records to verify that inmates are compensated in accordance with BOP policy.

2.4.2    Select 10 (review 15 if facility is on an annual review cycle) inmates with the FRP assignment "Part" and determine if SENTRY reflects the correct FRP assignment and a financial plan (using institution and non-institution resources to meet legitimate financial obligations) was developed.  Review their commissary accounts since the last monitoring to determine if payments are made.

2.4.3    Randomly select 10 inmates with the FRP assignment of "Refuse," and determine whether inmates who refuse to participate in IFRP receive appropriate consequences.

## 2.5 Furloughs/Escorted Trips

2.5.1    Randomly select five cases of inmates granted a social furlough and determine if they:

    a.    Were eligible for furlough based on anticipated release date.

    b.    Had approved community custody before departing the institution.

    c.    Signed their Conditions of Furlough form.

## 2.6 Victim/Witness Program

2.6.1    Randomly select six Victim/Witness Program cases (three initial and three release) that arrived or released and review their central files to determine the following:

    a.    Notifications were accomplished in a timely manner; Unit Manager certified on Attachment B (Victim Notification Record) that letters/notifications were mailed/completed.

b.   Crime victim(s) are not included on the inmate's telephone list.

## 2.7   Correspondence

2.7.1   Randomly review 10 administrative remedies from the contractor's log and determine if appropriate forms are available to inmates and responses were provided within the required time frame.

## 2.8   Residential Re-Entry Center Utilization/Release Notifications

2.8.1   Randomly select 10 inmates, excluding deportable aliens, projected for release within the next 6 months, who do not have a RRC designation, and review their central files to determine if a decision for RRC referral was established and release planning was accomplished.

2.8.2   Randomly select 10 inmates who were released who have a Public Safety Factor (PSF) of "Sex Offender," to determine if a Notification of Community Treatment Programs form addressed to the appropriate community supervision office is on file (excludes inmates releasing to detaining authorities).

2.8.3   Using the sample in step 2.8.2, determine if Prisoner Release Notification Forms were completed (as mandated by 18 U.S.C. § 4042(c).

2.8.4   Using the sample from 2.8.2, review their central files to determine if:

a.   A pre-release progress report is on file and was current before the inmates' release.

b.   A Notice of Release and Arrival Form is on file, dated correctly, and the appropriate district of supervision (including both sentencing district and district of supervision for approved relocation cases) is correct.

2.8.5   Randomly select five presumptive parole cases releasing within the next 7 months, and review documentation in the inmates' central file to determine if a record

review was completed 8 months before the presumptive parole date.

## 2.9  Escape Procedures

2.9.1    Determine if there have been any inmate escapes and review each inmate central file to verify a timely notification of escape addressed to the sentencing judge, prosecuting attorney, and the community supervision office is on file. (If VNS case ensure all applicable notifications are completed.)

## 2.10  Drug Treatment Program

2.10.1    At contract facilities that have a Residential Drug Abuse Program (RDAP), review 10 treatment plans to determine if:

    a.    A psycho-social assessment has been completed.

    b.    Incentives and sanctions are included.

    c.    Prerelease programming is conducted.

    d.    Coordination with community supervision authority and community-based treatment provider is documented.

2.10.2    Randomly select 5 inmates participating in RDAP and review their treatment program handbooks (i.e. interactive journals) to determine if they were used consistently to teach program concepts (use attached worksheet).

2.10.3    Randomly select and review one group assigned to each treatment specialist to determine if interactive groups are used to help inmates apply core program concepts to their behavior.

2.10.4    Determine if all DAP PART inmates are living in the designated RDAP quarters (except where exempted by policy) and if the inmates in the unit have the appropriate DRG SENTRY assignments.

2.10.5    Review the files of 10 inmates with a DAP PART
          assignment who have been in the program for 180 days or
          more to determine if the files contain the following:

          a.    A signed copy of the RDAP treatment agreement.

          b.    Completed Eligibility Interview with a provisional
                diagnosis, signed by the RDAP Coordinator.

          c.    Completed Treatment Planning Interview.

          d.    An individualized treatment plan based on the
                Treatment Planning Interview.

          e.    Documented progress review conducted every 60
                days.

2.10.6    At contract facilities that have a RDAP, review 10
          treatment summaries to determine if it summarizes:

          a.    The inmate's criminal history

          b.    The inmate's drug history.

          c.    The inmate's weaknesses as a participant.

          d.    The inmate's strength as a participant

          e.    The inmate's final treatment plan.

## 2.11  Central File Maintenance and Security

2.11.1    Randomly select and review 20 inmate central files to
          determine if:

          a.    Documentation is filed in proper sections.

          b.    FOIA-exempt material is stamped and properly
                filed.

          c.    Social intake screening results are on file,
                including completion of all questions.

          d.    A signed Acknowledgment Form addressing
                correspondence and inmate funds was done promptly

and properly upon the inmate's arrival to the institution.

e.   A document signed and dated by the inmate indicating he/she was made aware of "Rights and Responsibilities" is available.

f.   Documents signed and dated by the inmate indicating participation in unit and institution A&O programs are available.

g.   A document is on file that indicates each member of the classification team has individually interviewed newly arrived inmates within 5 working days of the inmate's assignment to that team/unit.

h.   When applicable, a completed and signed form is on file that indicates an inmate who is a citizen of a treaty nation was given the opportunity to indicate he/she is interested in transfer to their country of citizenship.

i.   A classification package, for inmates who qualified for and desire transfer, was completed and addressed to the Assistant Director, Correctional Programs Division.

j.   Accurate inmate IHP data is entered into SENTRY.

2.11.2   Review central file count records for a 90-day period in a minimum of two housing units to determine if:

a.   Central files have been counted daily, including halfway house, writ, and additional volume files.

b.   Central files are reconciled weekly with the SENTRY name roster and documentation is maintained for 90 days.

## 2.12 Admission and Orientation

2.12.1   Observe A&O and/or review documentation to ensure information is provided as outlined in policy to include the Sexual Abuse/Assault Prevention and Intervention Program.

## 3.0   CORRECTIONAL SERVICES

**Vital Functions:**

**VF #6**   A safe and secure environment is provided for staff and inmates through effective communication of operational concerns.  This includes verbal and written instructions, post orders, institution supplements, information dissemination, training, and crisis prevention.

**VF #7**   Intelligence information related to security concerns is gathered for dissemination to appropriate contract and BOP staff.

**VF #8**   An adequate security inspection system is provided to meet the needs of the institution.

**VF #9**   An adequate level of emergency readiness is maintained to respond to institution emergencies.

## 3.1   OPERATIONAL SECURITY

**Physical and Perimeter Security**

3.1.1   Review documentation and observe that perimeter fence alarm testing is conducted.

3.1.2   Determine through direct observation of indoor/outdoor areas of Health Services, Recreation, Religious Services, Education, Vocational Training, Food Service, rear dock areas, the perimeter fence, and two other randomly selected areas if there are any potential breaches of security due to materials and existing conditions (e.g., scrap metal, stacks of pallets that could be used to circumvent or traverse the fence or landscape, or other unusual conditions that could provide concealment or promote security inconsistencies).

**Tool Accountability**

3.1.3   Review the contractor's tool inventory documentation and observe all areas that possess tools or ladders to

determine if they are classified, stored, inventoried, issued, and supervised in accordance with local policy.

3.1.4    Review documentation for missing or compromised tools and determine if recovery procedures are followed.

## On-site Inspections

3.1.5    Randomly select six areas of the institution occupied by inmates (including the recreation yard, chapel, and dining room).  Observe and review documentation that staff conduct pat searches, area searches, and metal detector searches in accordance with local policy and that problems are documented.

3.1.6    Review 10 days of security inspections to determine if they are conducted daily, reviewed by the supervisor, and if reported problems are corrected within the required time frames.

## Entrance and Exit Procedures

3.1.7    Observe the contractor's entrance and exit procedures, including inmate visiting and rear gate, at least twice during the monitoring to determine compliance with local policy requirements.

## Keying Procedures

3.1.8    Examine the control center to determine if emergency keys are maintained for all areas and are easily distinguished from other institution keys.

3.1.9    Observe the contractor's practice for handling keys throughout the week of the monitoring and ascertain that it is consistent with local policy.

## Emergency Equipment and Training

3.1.10   Through observation and review of three randomly selected areas determine whether all intervention equipment, firearms, ammunition, and chemical agents are inspected, maintained, accountable, and stored in a secured area outside inmate housing and activity areas.

3.1.11    Review the intervention equipment, firearms,
          ammunition, and chemical agents inventory to ensure it
          matches the current BOP approved list of inventory.

## Inmate Accountability Procedures

3.1.12    Observe a formal stand-up count and an out-count from
          one area to determine if count procedures are in
          accordance with policy requirements, including SENTRY
          official count reporting.

3.1.13    Observe five impromptu census checks to determine if
          checks are conducted according to local policy.

## 3.2   INMATE MANAGEMENT

## Segregation

3.2.1     Review documentation in SHU for 10 randomly selected
          inmates admitted since the last monitoring (review 20
          if facility is on an annual review cycle) and determine
          if inmate discipline procedures and reviews are
          conducted as follows:

          a.   An Administrative Detention Order was issued
               within 24 hours.

          b.   Form 292s are completed and accurate for each
               shift.

          c.   Housing reviews are conducted in a timely and
               appropriate manner for each inmate.

3.2.2     Review supporting documentation for a randomly selected
          15 days and determine if unit officers are making
          irregular 30-minute checks.

3.2.3     Review and observe the contractors SHU procedures and
          post orders to determine if all local procedures are
          followed for:

          a.   Entrance/exit procedures.

          b.   Cell searches.

          c.   Handling and control of keys.

      d.    Use of restraints and escort procedures.

      e.    Searches (inmates, cells, and property).

**Drug Detection**

3.2.4      Observe one urinalysis test and review supporting documentation (e.g., surveillance lists, chain of custody for drug analysis forms, SENTRY urine surveillance logs) for 10 urinalysis tests to determine if all procedures for testing, storage, and handling of samples are in compliance with policy.

3.2.5      Observe two alcohol surveillance tests and review documentation (e.g., alcohol test log) for 10 alcohol surveillance tests to determine if testing procedures and testing equipment calibrations are completed in accordance with the manufacturer's  specifications and/or local procedures.

**Inmate Discipline**

3.2.6      Review a total of 10 disciplinary hearing officer packets to determine if:

      a.    Incident reports are written, investigated, processed within required time frames, and filed in accordance with policy (to include violations, formal statements, witnesses, physical evidence, action taken including use of force, etc.).

      b.    Written statements of the charges are received by the inmate within 24 hours.

      c.    UDC hearings are held within established time frames.

      d.    Disciplinary appeal procedures are properly addressed, appropriate, and within policy (to include the Notice of Right to Appeal, formal appeals, etc.).

**Intelligence**

3.2.7      Review the contractor's system for intelligence information and review documentation to determine:

    a.    Current STG/special inmate issues are analyzed, collected and safeguarded.

    b.    Telephone/mail monitoring issues are disseminated.

    c.    Inmate/staff investigative issues are appropriately maintained.

    d.    Urine and alcohol surveillance issues are collected and recorded.

    e.    Contraband issues are properly recorded and stored.

    f.    Contractor maintains a telephone monitoring system.

    g.    Contractor submits reports.

    h.    Financial transactions are monitored.

    i.    Intelligence is disseminated to institution executive staff.

3.2.8    Determine through observation if the:

    a.    IO office has adequate provisions for soundproofing (e.g., air ducts, vents, gaps around pipes) to prevent unauthorized individuals from overhearing conversations and confidential information.

    b.    Files are securely stored in cabinets and accessed only by IO staff; if any remote storage sites exist only IO staff have access to the actual IO files.

3.2.9    Interview and observe IO staff to determine they are familiar with the operation of the following:

    a.    Telephone monitoring equipment (to include remote monitoring stations).

    b.    Photography and recording equipment.

3.2.10    Review all BP-583 files for assault cases (to include sexual assaults) compiled over the past 6 months to determine if appropriate documentation is maintained to substantiate the facts of the incident.

3.2.11    Interview the IO and review documentation compiled over the past 6 months to determine if:

    a.    Evidence is gathered and stored in a secure location only accessible to IO.

    b.    If the act was covered by criminal law, it was referred to appropriate law enforcement officials for possible prosecution.

**Prisoner Transportation/Escorted Trip Procedures**

3.2.12    Review the contractor's transportation policy and procedures and observe inmate movement on two occasions during the monitoring to determine if staff are following established procedures.  If observation is not feasible, interview staff members (staff overseeing and members of escort) to determine their knowledge of these procedures.

**Emergency Preparedness**

3.2.13    Conduct a review of emergency plans to determine if they are current, staff signatures are included to acknowledge their review of the plans, and signed written agreements with outside agencies are maintained.

**4.0   EDUCATION AND RECREATION SERVICES**

**Vital Function:**

**VF #24**    The needs of the inmate population are evaluated and GED, ESL, and Recreational Programs are provided. Programs are accessible for the inmate population and program availability is communicated.

**4.1   Education Records**

4.1.1    Randomly select 20 inmate electronic education files to determine if they have:

      a.    Received an initial interview at the facility.

      b.    Appropriate GED and ESL education SENTRY assignments/codes.

4.1.2      Randomly select 20 inmate electronic education files to determine if progress assignments are properly documented for inmates sentenced under the VCCLEA/PLRA provisions.

4.1.3      Examine Class Schedules, Class Rosters, SENTRY EDC Rosters, and Testing Schedules to determine if inmates are afforded the opportunity to complete the GED and ESL programs.

4.1.4      Review the most recent quarterly roster report to ensure  appropriate use of SENTRY Group Codes G, E, V, and T for enrollments/completions.

## 4.2  Education Programs and Services

4.2.1      Examine documentation (i.e., activity schedule) for the past 3 months to determine if leisure activities (movies, games, social activities) are provided to meet the overall wellness needs of inmates and their diverse interests.

4.2.2      Observe a minimum of 2 recreation areas to determine if the institution is in compliance with the provisions of the Appropriations Bill (formerly Zimmer Amendment) as it relates to the following:

      a.    Viewing of movies rated R, X, or NC-17

      b.    Instruction or training for boxing, wrestling, Judo, Karate, other martial arts, or any bodybuilding or weightlifting equipment.

      c.    Use, maintenance, or repair of any electric or electronic musical instrument.

## 5.0  FOOD SERVICE

**Vital Functions:**

**VF #11**    Policy, procedures, and practices are in place for a safe, secure, and sanitary environment.

**VF #12**    Meals are nutritionally adequate, properly prepared, and attractively served.

**VF #13**    Policy, procedures, and essential resources are identified, developed, and managed to meet the operational needs of the Food Service Program.

## 5.1  Food Preparation and Sanitation

5.1.1    Conduct a food safety and sanitation inspection in all areas where food is stored, prepared, and served to determine if:

    a.    Food Service persons are providing service in a safe and sanitary environment (e.g., cleanliness, proper hand and food washing, safety shoes, and use of equipment and tools).

    b.    Temperatures are maintained on hot and cold foods that would allow for safe human consumption.

    c.    Leftovers are properly covered and dated.

    d.    Proper holding, thawing, heating, cooling, and serving techniques are used to prevent contamination.

    e.    Food items are properly covered, sealed, and handled to prevent contamination.

    f.    Inmates and other persons working in Food Service are monitored each day for health and cleanliness.

5.1.2    Review one weekly inspection per month to determine if weekly inspections of all Food Service areas (including dining and food preparation areas and equipment) are completed.

5.1.3 Randomly select 30 daily logs (to include 10 weekend/holiday days) to determine the following temperatures are met (unless national or State health codes specify otherwise):

    a. Shelf goods are maintained at 45 to 80 degrees Fahrenheit.

    b. Refrigerated foods are maintained at 35 to 40 degrees Fahrenheit.

    c. Frozen foods are maintained at 0 degrees Fahrenheit or below.

    d. Dishwasher final rinse temperature is operating at the manufacturer's specifications and chemical sanitizer strength is maintained at the manufacturer's recommended level when a low-temp system is used.

    e. Hand washing sinks are providing water in accordance with state and local codes.

5.1.4 Review Master Cycle Menus on file to verify that dietary allowances are reviewed at least annually by a certified nutritionist or dietician to verify that they meet nationally recommended allowances for basic nutrition.

    a. Review menu evaluations on file for the past 6 months to ensure Food Service supervisory staff quarterly verify adherence to established basic daily servings.

    b. Observe meals served and review documentation to verify that when substitutions are made to the menus they are noted and of equal nutritional value.

    c. Randomly select 3 food items to determine if food is palatable.

5.1.5 Review local policy and 10 medical files of inmates assigned to work in Food Service to verify that pre-assignment and medical exams were conducted in

accordance with the contractor's policy and documented in the medical files.

5.1.6    Review documentation and procedures for providing alternate feeding to determine if:

    a.    Written approval is on file from the warden/administrator and the responsible health authority.

    b.    Basic nutritional requirements are met.

## 5.2  Special Feeding Programs

5.2.1    Review 10 medical diet prescriptions to determine prescriptions are approved by the responsible health authority and diet prescriptions are reviewed every 6 months for accuracy.

5.2.2    Review documentation for five inmates on special religious diets and interview the Food Service manager to determine approval is from a qualified religious authority.

5.2.3    Review 10 randomly selected certified foods to determine they have a current, reliable, and nationally recognized Orthodox certification.

5.2.4    Review and observe the Certified Food Program production site and determine if:

    a.    Utensils are easily identifiable and are exclusively maintained for the certified food program.

    b.    Separate equipment is used to clean equipment and utensils used for the certified food program.

    c.    The certified food menu is followed.

    d.    A nutritional analysis has been completed and filed.

5.2.5    Observe the serving of three meals to verify that special diet meals are provided and restricted to approved inmates.

## 6.0  HEALTH SERVICES

**Vital Functions:**

**VF #14**   Open access to health care is provided for all inmates in an environment that is safe and secure.

**VF #15**   Quality health care is provided using qualified personnel and resources in accordance with applicable standards.

**VF #16**   Health information data is recorded accurately, legibly, in a timely manner, and maintained in accordance with applicable BOP policy.

**VF #17**   All inmates are screened for mental health, substance abuse, and other behavioral problems and receive appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment.

## 6.1  Infectious Disease

6.1.1   Review 10 medical records of inmates' arriving at the institution with positive PPD (or converted to positive), to determine if there was proper follow-up and treatment initiated by the physician and the inmates were followed-up in a chronic care clinic.

6.1.2   Randomly select 10 health records (review 20 if facility is on an annual review cycle) and review documentation to verify that inmates are screened (PPD Mantoux method or PA chest X-ray) for tuberculosis within 48 hours of intake or annually, when appropriate.

6.1.3   Review all health records, not to exceed five, of inmates with active TB (or history of active TB), five records of inmates with a history of PPD conversion, and five records of inmates with positive HIV infection and compare the information to the respective SMD roster to determine if the classification data is accurate.

## 6.2  Inmate Health Records

6.2.1      Review 10 inmate health records to determine records
           are legible, written in black ink, and if:

           a.    Inmate health records are filed by register number
                 by Terminal Digit two filing system.  Only the
                 last two digits of the first five digits are
                 color-coded and placed on the chart.

           b.    An allergy warning label is affixed, and in the
                 proper location, if appropriate.

           c.    Each page contains the inmate's full name,
                 register number, and institution name (except
                 Patient Problem List, laboratory and X-ray backing
                 sheets, and immunization records).

           d.    Only approved abbreviations are used.

           e.    The signature is authenticated.

           f.    Errors are properly corrected.

           g.    Entries on the Chronological Record of Patient
                 Care (or contractor's equivalent form) are
                 documented using the S.O.A.P.E. format.

           h.    The problem list is complete.

6.2.2      Determine through observation that only authorized
           personnel have access to inmate health records.

## 6.3  Patient Care

6.3.1      Review 10 community inpatient hospitalizations to
           determine if SMD data is entered into SENTRY in
           accordance with BOP policy.

6.3.2      Observe health-trained staff performing intake
           screening on three inmates to determine if:

           a.    Patient privacy is provided.

b.    Immediate psychiatric and health care needs are
identified and met, including provisions for
medication and medical isolation (if required).

c.    Health screenings for inmates are completed upon
arrival at the institution and include:

1.    Inquiry into current illness and health
problems, including infectious diseases,
dental, mental, substance abuse, use of
medications, and hospitalization for mental
disturbance or suicide.

2.    Observation of behavior, body deformities,
skin condition, evidence of abuse or trauma,
drug abuse, and mental status.

3.    Medical disposition (i.e., general population
with/without prompt referral for health care,
and emergency medical treatment).

6.3.3    Review 10 Medical Summary of Federal Prisoner/Aliens in
Transit (BP-659) forms of inmates that have transferred
out of the institution to determine if:

a.    Medication instructions are written in lay terms.

b.    TB screening has been appropriately documented.

c.    There are stop/no stop dates, when appropriate,
for medications.

6.3.4    Examine 10 health records of newly committed intra-
system and inter-system transfer inmates who have
arrived during the last 6 months to determine if a
health appraisal was completed and documented within
the required time frames.

6.3.5    Using the samples in 6.3.4, retrieve the inmate's MDS
and compare it to the medical record information to
determine if appropriate MDS entries were made in
accordance with BOP policy.

6.3.6    Observe sick call procedures to determine if they
include:

a.   Procedures for referral to a physician.

b.   Access to medical care to inmates in segregation.

c.   Sick call sign-up procedures that provide for privacy and access.

6.3.7   Interview the HSA to determine if there are infirmary beds.  If so, review at least 5, but no more than 10 inmate health records and observe inmates placed in the institution infirmary room to determine if a separate, distinct infirmary section of the medical record is kept for each inmate and:

a.   All inmates are within sight or sound of a staff member.

b.   Health care personnel are on duty 24 hours per day.

c.   Care is provided in accordance with the contractor's written policies and procedures and in compliance with applicable state statutes and local regulations, including the scope of infirmary care.

6.3.8   Interview the HSA to determine if the facility has an observation room and, if so, review the local policy and the health records of at least 5, but not more than 10, inmates who have been placed in the observation room to determine if care is in compliance with policy.

## 6.4  Pharmacy

6.4.1   Review documentation to determine if there are controls (i.e., temperature control logs, thermometer alarms) in place to verify that minimum standards are maintained for temperature control to meet compendia/ FDA Standards.

6.4.2   Count all controlled substances, needles, syringes, and medical instruments to determine the inventories are accurate.

6.4.3      Interview staff and observe to determine that only
           qualified staff administer medication.

6.4.4      Observe to determine if all substock controlled
           substances are stored in an approved secure (stationary
           steel cabinet with separately key-locked overlapping
           steel doors or a safe with a keyed padlock) cabinet.

6.4.5      Review a random sample of 10 medication orders for
           controlled substances to determine if:

           a.    They are prepared and signed as required by the
                 Controlled Substance Act.

           b.    Physician or dentist signs/countersigns in
                 accordance with their applicable license and/or
                 state law requirements.

           c.    DEA Schedule II substances have the DEA number
                 attached.

6.4.6      Interview the responsible staff administering
           controlled substances.  By observation, determine if
           the following procedures are completed:

           a.    Medication sheet is prepared for each patient.

           b.    Patient is identified before administration of
                 controlled substances.

           c.    Medication is drawn immediately from substock and
                 recorded on the medication sheet.

**6.5  Dental**

6.5.1      Examine 10 health records of newly committed intra-
           system and inter-system transfer inmates who have
           arrived during the last 6 months to determine if:

           a.    A dental health appraisal was completed and
                 documented within the required time frames.

           b.    A dental health appraisal was conducted by the
                 dentist.

      c.   Screening was conducted by a dentist, dental assistant, or dental hygientist.

6.5.2     Randomly select 10 inmate dental records of inmates who have been at the institution more than 12 months to verify that they have received an annual dental examination by a dentist and that a treatment plan exists.

6.5.3     Review 10 dental records of dental surgical (exodontia) inmates to determine if a consent form is used and signed by the patient before the surgical procedure and witnessed by the provider, with all entries accurate.

## 6.6   Nursing Services

6.6.1     Review 10 inmate medical records with nursing entries to determine if nursing care reflects position descriptions and nursing protocols and is in accordance with the State Nurse Practice Act.

6.6.2     Review staffing patterns for institutions that utilize Licensed Practical Nurses (LPNs) or EMTs to determine if they are working under the guidance and supervision of registered nurses, mid-level practitioners, or physicians, and if they are working within their scope of practice.

## 6.7   Mental Health Services

6.7.1     Review the contractor's policy regarding psychological assessments for inmates housed in SHU and review the SHU Admissions/Release log. Select 10 inmates who were housed in SHU for longer than 30 days. Examine documentation to verify initial psychological assessments (when appropriate) were conducted by a mental health professional licensed or certified by the state to provide mental health services and subsequent follow-up assessments are conducted according to local policy.

6.7.2     Examine 10 medical records of newly committed or inter-system transfer inmates who arrived during the last 6 months and determine if a mental health appraisal was completed and documented by a mental health professional licensed or certified by the state to

provide mental health services within the required time frames established in the contractor's local policy.

6.7.3    Interview the clinical director or Health Services Administrator to determine if any inmates are currently in psychiatric seclusion or psychiatric restraints; if so, review current cases to determine if management is in compliance with local policy.

6.7.4    Examine each suicide watch area and room for privacy, unobstructed vision, the presence of fixtures, articles, or features that would hinder inmate safety.

6.7.5    Review all cases of sexual assault and local policy and procedures on Sexual Assault to determine if inmates are referred under appropriate security procedures to a community facility for treatment and gathering of evidence or if procedures are performed in-house by specifically trained examiners and the following are addressed:

   a.    History is taken by health care professionals who conduct an examination to determine the extent of physical injury and to determine if referral to another medical facility is indicated.

   b.    Provision is made for testing of sexually transmitted diseases and counseling.

   c.    Prophylactic treatment and follow-up for sexually transmitted diseases are offered.

   d.    Evaluation by a mental health professional is made.

## 6.8  Clinical Care Review by Physician for Contract Facilities

6.8.1    Randomly retrieve the records of 10 newly committed or inter-system transfer inmates who required a physical examination.  Review the clinical pertinence of the history and physical examination for the following and determine if:

   a.    The examination was directed to address the patient's stated medical history and included an associated system examination.

b.   Diagnostic tests ordered by the examiner were clinically pertinent to the history and physical findings.

c.   The treatment plan is clinically pertinent to the examination findings.

d.   If the examination was performed by a MLP, the abnormal findings are reviewed by a physician.

e.   Program, duty, and housing restrictions are addressed.

6.8.2   *Diabetes* - Randomly select five health records in this category.  Review records comparing them to local clinical guidelines and acceptable standards of practice to determine:

a.   Vital signs were measured at every encounter.

b.   Routine HbA1c levels are taken, no less than twice/year for well patients meeting treatment goals, more frequently for those not meeting goals.

c.   A routine urinalysis is current.

d.   Lab tests including Lipid panel, Glomerular Filtration Rate (GFR), microalbuminuria, TSH, electrolytes) are current.

e.   An annual comprehensive dilated eye and visual examination is made by an ophthalmologist or optometrist for all type I diabetics who have had the disease for five or more years, and for all inmates with type II diabetes.

f.   An annual comprehensive foot examination to identify risk factors for amputation and to assess sensory loss through monofilament testing.

g.   ACE inhibitors are used in diabetics with proteinuria.

h.  Entries on the Chronological Care form (SF-600) are in accordance with policy, using the Subjective Objective Assessment Plan and education (SOAPE) and format; the plan includes studies ordered, therapies administered, and specific instructions to the patient.

i.  A physician or mid-level practitioner evaluates patient requiring ongoing follow-up, as indicated in the contractor's policy.

j.  Immunizations are in accordance with standards of care.

k.  Baseline EKG is completed and follow-up provided as needed.

6.8.3   *Hypertension* - Randomly select five health records in this category.  Review records comparing them to local clinical guidelines and acceptable standards of practice to determine:

a.  Vital signs were measured at every encounter.

b.  Blood pressure reading $\leq$140/90 at most recent hypertension encounter is addressed as a treatment goal and there is documented evidence as to why the goal has not been met, including changes in treatment modalities as necessary.

c.  An annual fundoscopic examination for evidence of retinopathy is completed per policy.

d.  Annual laboratory work includes BUN, creatinine, urinalysis, electrolytes, and lipids.  If labs are abnormal, those were addressed properly.

e.  Entries on the Chronological Care form (SF-600) are in accordance with policy, using the SOAPE format; the plan includes studies ordered, therapies administered, and specific instructions to the patient.

f.  A physician or mid-level practitioner evaluates patients requiring ongoing follow-up as indicated in the contractor's policy.

       g.   A baseline EKG was done.

6.8.4    *Pulmonary* - Randomly select five health records in this category.  Review records comparing them to local clinical guidelines and acceptable standards of practice to determine:

       a.   Vital signs were measured at every encounter.

       b.   A peak flow meter reading is taken at each visit on patients requiring routine aerosol inhaler use.

       c   A laboratory theophylline level is monitored regularly if the patient is on medication.

          Inhaled steroids are used when clinically indicated.

       d.   Entries on the Chronological Care form (SF-600) are in accordance with policy, using the SOAPE format; the plan includes studies ordered, therapies administered, and specific instructions to the patient.

       e.   A physician or mid-level practitioner evaluates patients requiring ongoing follow-up as indicated in the contractor's policy.

       f.   Immunizations are current.

       g.   Baseline Chest X-ray is completed and followed as clinically necessary.

       h.   Asthma classification is accurate.

6.8.5    *HIV* - Randomly select 10 health records in this category.  Review records comparing them to local clinical guidelines and acceptable standards of practice to determine if:

       a.   Western Blot confirmed positives are followed with CD4 and HIV-RNA periodically as clinically indicated.

       b.   An evaluation includes a focused physical examination, fundoscopic exam, CBC, serum

chemistries, urinalysis, RPR/FTA, TB test, Chest X-ray, Toxoplasma gondi antibody, hepatitis serologies, fasting lipids, glucose.

c.   Treatment is in accordance with current USPHS/CDC recommendations.

d.   Antiretroviral therapy is provided for inmates with AIDS or CD4+ T-cells < 350/mm$^3$.

e.   An opthalmalogical exam for CMV retinitis is provided every 6 months for inmates with CD4+ T-cells < 50/mm$^3$.

f.   All immunizations are in compliance with the most recent CDC recommendations.

g.   Inmates tested for HIV received pre and post test counseling about the disease and it is documented in the health records.  If the patient was diagnosed prior to arrival, and counseling has not been done, then counseling is completed by qualified staff at the current facility.

6.8.6   *Hepatitis C* - Randomly select five health records in this category.  Review records comparing them to local clinical guidelines and acceptable standards of practice to determine:

a.   The baseline evaluation includes:  CBC with differential and platelet count, serum liver transaminases (ALT and AST), bilirubin, alkaline phosphatase, albumin, and prothrombin time and other tests as clinically indicated.

b.   HIV serology was done.

c.   Antiviral drug therapy has been provided when clinically indicated in accordance with NIH consensus statement.

d.   If inmates have cirrhosis and large esophageal varices, non-selective beta-blockers are used.

    e.   Evaluations include a targeted physical examination and if the inmate is not on treatment monitoring of pertinent lab tests.

    f.   Immunizations are in accordance with standards of care.

6.8.7   *Lipids* - Randomly select five health records in this category. Review records comparing them to local clinical guidelines and acceptable standards of practice to determine:

    a.   Vital signs and BMI were measured at every encounter.

    b.   Evaluation includes a focused physical examination.

    c.   Diagnostics labs and studies are ordered as clinically indicated.

    d.   Education is documented about hyperlipidemia, risk factors and management during clinical evaluations.

6.8.8   *Infection Control/Active TB* - Randomly select five health records in this category since the last monitoring. Review records comparing them to local clinical guidelines and acceptable standards of practice to determine if there is appropriate:

    a.   Timeliness of diagnosis, containment, treatment, and contact investigation, including provision of preventive therapy to infected contacts.

    b.   Drug regimens and adherence to treatment for latent tuberculosis.

6.8.9   *Infectious Disease Outbreaks and Isolated Cases* - Randomly select five health records in this category since the last monitoring. Review records comparing them to local clinical guidelines and acceptable standards of practice to determine if the management/containment of all infectious diseases (e.g., varicella, MRSA) was adequate.

6.8.10    *Infectious Disease/Reportable Diseases* - Randomly
          select five health records in this category.  Review
          records comparing them to local clinical guidelines and
          acceptable standards of practice to determine if the
          management/containment of infectious diseases (i.e.,
          cocci, STDs) that required notification to the State
          Health Department was adequate.  Review these on a
          case-by-case basis depending on infection control
          significance.  Review whether pertinent clinical and
          serological examinations were done, including HIV test
          and immunizations as needed.

6.8.11    Review exposure control documentation and select
          five inmates in occupational and non-occupational
          exposure incidents (i.e., bloodborne pathogens,
          post-exposure evaluation, and follow-up) which
          have occurred since the last monitoring to
          determine if:

          a.    Immediate emergency care was offered.

          b.    Counseling was provided.

          c.    Mandatory testing was conducted.

          d.    Anti-retro viral medications were offered if
                clinically indicated.

          e.    Post exposure counseling was provided by a
                physician.

          f.    Post exposure follow-up was completed.

6.8.12    Oncology - Randomly select five health records in this
          category.  Review records comparing them to local
          clinical guidelines and acceptable standards of
          practice to determine if overall medical management was
          appropriate.

6.8.13    *Psychiatry* - Review five inmates in Mental Health
          clinics to determine:

          a.    The appropriate psychotropic medication is used
                for the specific psychiatric disease.

          b.    Inmates have been evaluated by a physician.

    c.    Medication is prescribed by a physician.

    d.    Informed consent is completed properly (when required by the local jurisdiction).

    e.    A treatment plan exists.

6.8.14    Review 10 medication orders made since the last monitoring by a physician, MLP, or nurse to determine the following:

    a.    Prescribed medication was appropriate for the problem assessed and identified.

    b.    Drug allergies and reactions were considered when prescribing medications.

    c.    An automated system is in place to record each inmate's prescribed medication.

    d.    If the medication order was by an MLP or nurse, they were authorized to order that specific medication.

6.8.15    Review the last 10 emergency responses by Health Services staff (e.g., Nurse Practice Acts, privileging statements, training records), to determine if:

    a.    Emergency care was provided within the scope of practice by responding staff.

    b.    If ACLS protocols were initiated, staff were properly trained and certified.

    c.    A physician was involved in the evaluation and care of the inmate.  If not, one was consulted for recommendations.

    d.    Emergencies were responded to within four minutes as required by policy.

    e.    Transportation to the appropriate health care setting was done in a timely manner.

       f.   Medical management of inmates was in accordance with policy, guidelines and standards of care.

6.8.16   Review 10 selected emergency town trips for the following to determine on site medical management was in accordance with policy and standards of care.

6.8.17   Review 10 requests for routine or urgent community care that have been completed to determine:

       a.   A system is in place to evaluate requests and determine the urgency of the requested offsite care, such as a Utilization Review Committee.

       b.   A physician in the URC reviews requests for off-site care.

       c.   The offsite care occurred within the following established institution time frames. (Example: Emergent with 1 hour; urgent within 72 hours; routine within 12 weeks.)

       d.   A physician at the institution reviewed recommendations made as a result of the offsite care.

       e.   If the physician did not agree with recommendations for treatment or further diagnostic evaluation made by the offsite care encounter, the reason and an alternative plan is documented in the inmate's health record.

6.8.18   Review the cases of 10 inmates who required community hospitalization (i.e., admitted with asthma, congestive heart failure, active tuberculosis, detoxification, myocardial infarction, AIDS, seizures, delirium, and acute psychosis) to determine if:

on-site medical management issues were in accordance with policy and standards of care.

6.8.19   Review 10 inmate grievances whose claim is for denied medical services and compare them to the inmate's record to determine the validity of the complaint and that:

    a.    Appropriate medical intervention has been done.

    b.    The intervention has been done within a reasonable time period to prevent undue harm or further degeneration of the medical condition.

6.8.20    Review inmate deaths since the last monitoring to determine if:

    a.    Medical management of the inmate's condition was in accordance with policies and standards of care.

    b.    A mortality review was conducted within the specified time frame.

6.8.21    Randomly select 10 records of inmates who have been at the Facility between 6 months and 12 months to determine if:

    a.    A prevention baseline visit has been completed in accordance with the US Preventive Services Task Force.

    b.    TB screening was conducted.

    c.    HIV testing was offered to all sentenced inmates.

    d.    Screening for abdominal aortic aneurysm is conducted for male smokers between 65-75 years of age.

    e.    STD testing, including Syphilis, was done if inmate has risk factors.

    f.    Hepatitis tests were done if inmate has risk factors.

    g.    Fecal occult blood tests were done if inmate has risk factors.

    h.    Diabetes screening with Fasting Serum Glucose was done for inmates with BP 185/80 and other risk factors.

    i.    Annual audiogram was done for inmates over 65 years of age and inmates with occupational risks.

      j.    Lipid screening was done for inmates with risk factors.

      k.    Based on age and risk factors, the following vaccines have been administered:  TDP, Influenza, Pneumococcal, HAV, HBV, MMR, meningococci.

      l.    Hypertension screening is conducted according to age and risk factors.

      m.    All inmates are screened for substance abuse.

      n.    Vision screening is conducted for all inmates at intake physical, and annually for those over 65 years of age.

## 7.0  HUMAN RESOURCES

**Vital Functions:**

**VF #18**    Adequate staffing levels are maintained.

**VF #19**    Staff resources are properly administered and managed.

**VF #20**    All resources are managed to ensure training requirements and needs are provided.

## 7.1  Personnel Security

7.1.1    Review documentation for 8 staff and 2 subcontractors hired in the past 6 months to determine the following was conducted before the enter-on-duty (EOD) date:

      a.    The BOP granted employment approval.

      b.    A Limited Background Investigation was requested.

      c.    A urinalysis was conducted and the results were negative.

      d.    The applicant is a U.S. citizen and meets the residency requirements (if not, a waiver was obtained).

      e.    Derogatory information revealed during pre-employment was resolved and, if necessary, waivers from the BOP were obtained.

      f.    Each employee received Standards of Conduct.

      g.    Each employee received 40 hours of mandatory orientation training (including sexual abuse/assault prevention and intervention training) before assuming his/her assignment.

      h.    Contractor records ensure that staff provided access to sensitive data systems received a ACI (from the date ACI went into effect).

7.1.2    Review 8 staff and 2 subcontractor LBI files with EOD dates between 12 and 18 months to determine if the contractor resolved derogatory information contained on the LBI results and necessary waivers were obtained within 1 year of an employee's EOD.

7.1.3    Randomly select 8 staff and 2 subcontractors with EOD dates between 6 and 6 ½ years to determine the contractor requests a periodic reinvestigation, suitability determinations were made, and necessary waivers were obtained in a timely manner.

## 7.2  Staffing

7.2.1    Randomly select five staff (including subcontractors and volunteers) required to possess professional credentials (i.e., chaplains, teachers, medical personnel) to determine if credentials are maintained and kept current.

## 7.3  Volunteers

7.3.1    Identify five volunteers who have been selected to volunteer within the last 6 months and review documentation to determine if approval was granted by the BOP, and they received appropriate orientation training (including standards of conduct and sexual abuse/assault prevention and intervention training before participating in facility volunteer activities).

## 7.4 Staff Training

7.4.1      Randomly select 20 staff (including 2 subcontractors
           and 2 volunteers) and review documentation to determine
           if annual training and sexual abuse/assault prevention
           and intervention training was completed.

7.4.2      Review training records for 10 staff assigned to armed
           posts to determine staff have successfully completed
           firearms training within the last 12 months prior to
           assignment to the post.

## 8.0  INMATE SERVICES (COMMISSARY/TRUST FUND)

**Vital Functions:**

**VF #21**    Inmates are provided the privilege of an inmate
              telephone system and obtaining merchandise through the
              operation of a commissary.  Effective security measures
              are in place to prevent misuse of the telephone system.

**VF #22**    Inmate funds and property are properly maintained and
              accounted for during incarceration.

**VF #23**    Clothing, linens, toiletries, and laundry services are
              provided to inmates.

## 8.1  Commissary

8.1.1      Randomly select 10 commissary items from the current
           sales list and have the contractor provide
           documentation to verify the price does not exceed BOP
           markup (to include State tax if applicable).

## 8.2  Inmate Funds

8.2.1      Review documentation (i.e., release authorization,
           cancelled checks) for 10 BOP inmates released or
           transferred to determine if funds were disbursed within
           5 working days of inmate release/transfer.

8.2.2      Review files for 10 BOP inmates released to foreign
           destinations to verify that all funds were given to the
           inmate immediately before release.

**8.3  Inmate Benefit Fund**

8.3.1       Review two of the past 6 months (review 4 if facility
            is on an annual review cycle) of Inmate Benefit Fund
            Expenditures, other than resale items, to determine the
            appropriateness of expenditures.

**9.0  INMATE SYSTEMS (MAIL/RECEIVING & DISCHARGE/RECORDS)**

**Vital Functions:**

**VF #25**    The institution provides inmate mail services, which
            include timely processing and accountability of funds,
            special mail, and general correspondence.  Special care
            is given to the detection of contraband and prohibited
            acts.

**VF #26**    Inmates are lawfully committed and processed in a safe
            and secure environment, with emphasis on the detection
            and elimination of contraband from their persons and
            property.

**VF #27**    The appropriate execution, processing, and verification
            of documents are performed to ensure accurate and
            timely release of inmates.

**9.1  Mail Room**

9.1.1       Review the contractor's local policy and documentation
            and observe the processing of incoming/outgoing mail
            during the monitoring to determine if:

            a.   Mail and packages are processed within the
                 required time frame (including mail for inmates in
                 segregation).

            b.   Incoming inmate general correspondence accepted
                 for delivery is opened and inspected for
                 contraband.  Verify negotiable instruments are
                 intercepted.

            c.   Mail is rejected when based on legitimate
                 institutional interests of order and security and
                 inmates are notified of rejected correspondence.
                 If no mail is rejected during observation, review
                 documentation for the last month.

       d.   Special mail is properly identified and opened only in the presence of the inmate.

9.1.2    Review the procedures for forwarding first-class letters and packages received after an inmate has been released to determine mail is forwarded per policy.

## 9.2 Receiving and Discharge (Admissions)

9.2.1    Observe the intake processing procedure for new commitments or (if observation is not feasible) review local policy and interview one staff member to determine if:

       a.   Upon admission, inmate data is loaded into SENTRY in accordance with policy (i.e., accurate and timely).

       b.   A visual search is performed at the earliest possible time and a metal detector is used.

       c.   Inmates are issued clean clothing.

       d.   Inmate photographs and fingerprints are taken.

       e.   Inmate personal property is properly searched and inventoried.

## 9.3 Releases

9.3.1    Observe the procedures and controls for the release of inmates or (if observation is not feasible) review local policy and interview one staff to determine if:

       a.   Release paperwork is checked for validity and method of release.

       b.   Proper and timely clearances have been obtained (e.g., CIM and Prisoner Coordination).

       c.   The inmate is properly identified in all releases (e.g., photograph, questioning, fingerprint).

       d.   A Release Authorization (BP-392) is used for inmates being permanently released.

    e.    Proper signatures are obtained on the Release Authorization (BP-392) (e.g., the form is signed by a staff member identifying the inmate, another staff member releasing the inmate, and, if applicable, the agent assuming custody).

    f.    The inmate receives his/her copies of the release paperwork and the original BP-392 is kept in the Judgment and Commitment (J&C) file after release.

    g.    The inmate receives a supply of medication, if appropriate.

    h.    The correct SENTRY ARS codes indicated on the release documentation are provided, and the appropriate SENTRY transactions are completed upon the inmate's departure from the institution.

## 9.4 Records Office (J&C Files)

9.4.1    Review 10 files of inmates received as transfers to determine if a thumbprint is taken upon arrival and the form is completed and filed in the J&C file.

9.4.2    Review monthly or quarterly audit documentation for the past 6 months to determine if there is proper accounting for J&C files.

9.4.3    Review 10 inactive central files to determine the correct expiration and disposal dates are posted to the outside of the file.

## 9.5 Detainers

9.5.1    Review 10 J&C files of inmates having detainers to determine if SENTRY reflects the correct information (including who filed the charges and the term-in-effect).

9.5.2    Of the files reviewed in 9.5.1 determine if a Detainer Action Letter is on file and if the:

    a.    Detainer action is correctly reflected in the J&C file.

      b.   Notice of Untried Indictment, Information, or Complaint and Right to Request Disposition (BP-235) is used to notify inmates of their rights for disposition of pending charges (with the exception of probation and parole violator warrants).

9.5.3    Review 10 J&C files for inmates temporarily released on writ/IAD to determine if a 2-month follow-up is conducted to determine their status and that the follow-up is documented in the J&C file or through use of another tracking system.

9.5.4    Review 10 J&C files of inmates having detainers and scheduled for release within the next 60 days to determine proper notification was made to detaining authorities.

## 9.6  File Retirement

9.6.1    Review the tracking system used to determine if all consolidated files are forwarded to ISM no later than 30 calendar days from the date the inmate releases.

9.6.2    Review the Record Transmittal and Receipts (Form 135) to determine if files are retired annually.

## 10.0  SAFETY AND ENVIRONMENTAL HEALTH/FACILITIES

**Vital Function:**

**VF #29**    All facilities are safely operated and maintained in accordance with applicable laws, codes, and regulations.

## 10.1  Government-Owned Facilities

10.1.1    Review TMS reports and determine if TMS is used to track maintenance, inspection, and testing activities (i.e., emergency generators, boilers, chillers, high-mast lighting system, and fire protection equipment).

## 10.2  Environmental Programs

10.2.1    Review the waste disposal documentation and observe three living/work areas throughout the facility to

determine if trash and garbage are disposed of in accordance with applicable Federal, State, and local codes/regulations.

10.2.2   Determine if the facility's potable water supply, whether owned and operated by the public water department or the institution, is certified by an independent, outside source to be in compliance with jurisdictional laws and regulations.  If supplied by a non-public water source, review documentation for a 2-week period within the last 6 months to determine if it is tested daily and results are certified by the local jurisdiction.

10.2.3   Review local policy and procedures on bio-hazardous waste to ensure proper containment, collection, and disposal.

## 10.3  Oversight (Inspections and Reports)

10.3.1   Review file documentation for 10 areas (including a minimum of one housing unit and Health Services) to determine if weekly Fire Safety and Sanitation inspections are conducted.

10.3.2   Review monthly inspection reports for 10 areas and review documentation to determine if inspections are conducted by a fire safety officer in all areas of the facility.

10.3.3   Review the procedures and practices that govern the control and use of flammable, toxic, and caustic materials for Safety, Recreation, Facilities, Food Service, and one to three randomly selected areas to determine if the work practices and storage areas are in compliance with OSHA and NFPA.

In addition, verify that MSDS are obtained on all flammable, toxic, or caustic substances for the above-selected areas.

10.3.4   Review five sites and review documentation to determine if a personal protective equipment (PPE) assessment has been conducted to identify work areas and operations that require PPE for workers.  Observe work practices

to determine workers are wearing the proper PPE when applicable to the work they are performing.

10.3.5    Through review of supporting documentation and observation determine if there is a lockout/tagout program for stored energy equipment and if the program addresses:  (OSHA 29 CRF, 1910.147)

    a.    Locks, tags, chains, wedges, key blocks, adapter pins, self-locking fasteners, or other hardware provided for isolating, securing, or blocking of machines or equipment from energy sources are present.

    b.    Lock-out/tag-out devices are not used for other purposes.

    c.    Lock-out/tag-out devices are singularly identified.

    d.    Lock-out/tag-out devices indicate the identity of the employee applying the device.

## 10.4  Life Safety/Personal Protective Gear

10.4.1    Through review of supporting documentation and observation, determine if a Respiratory Protection Program is in effect and meets the following requirements:  (OSHA 29 CFR 1910.134)

    a.    A written institution supplement or plan on respiratory protection.

    b.    The plan identifies specific work areas and hazards requiring the use of respirators.

    c.    Specific procedures for staff and inmates to obtain medical clearances, follow-up medical clearances, and fit testing.

    d.    Specific procedures for inspecting and cleaning respirators.

    e.    Specific procedures for storing respirators, including SCBA's and gas masks.

    f.    Training requirements and annual retraining.

g.  Established recordkeeping procedures for medical
    clearances and fit-testing records.

h.  Inmates using respirators have been medically
    cleared and fit-tested.

10.4.3  Through observation and review of documentation
        determine if:  (OSHA 29 CFR 1910.29; 1910.67 and
        1910.174)

a.  Forklifts are equipped with roll bars and operable
    strobe lights, backup alarms, and seatbelts.

b.  Staff and inmate operators received hands-on
    training and instruction in the proper operation
    of equipment.

c.  Staff and inmate operators are wearing seatbelts
    while operating a forklift.

d.  Portable scaffolding and work platforms meet
    applicable safety requirements.

e.  Vehicle-mounted bucket lifts and other similar
    equipment meet applicable safety requirements.

10.4.4  Through review of supporting documentation and
        observation determine if there is an assured grounding
        program in effect, or portable GFCI protection is
        required.  (29 CFR 1926.404 OSHA)

10.4.5  Observe the Facility Department workshop and the Food
        Service Department to determine if machines/machinery
        are properly guarded.  (OSHA 29 CFR 1910 Subpart O)

10.4.6  Review the written pest control procedures in place and
        determine if the following requirements are met:

a.  Logs are maintained.

b.  Pest inspections are conducted.

c.  If required by the state, an institution staff
    member meets requirements for state certification.

10.4.7    Determine through observation of 10 areas, including
          housing units and Health Services, that fire and smoke
          barriers are maintained in accordance with NFPA Life
          Safety Codes; e.g., doors operate and there are no
          unprotected penetrations of fire walls or smoke
          barriers.  (NFPA 101)

## 10.5  Fire Protection

10.5.1    Review documentation to determine if fire detection,
          communication, alarm annunciation, suppression, and
          related equipment are operated, inspected, maintained,
          and tested in accordance with National Fire Codes.

10.5.2    Review documentation to determine if the Fire Emergency
          Response Plan has been reviewed by a certified outside,
          independent inspector or someone trained in the
          application of the National Fire Code, and was issued
          to the local fire jurisdiction.

10.5.3    Randomly select five areas of the institution and
          observe and review documentation to determine if:

          a.   Buildings are in compliance with National Fire
               Codes.

          b.   Exits are appropriately marked and maintained.

          c.   Evacuation diagrams are posted and oriented in
               visible areas.

          d.   Fire protection equipment is available.

          e.   Quarterly drills are conducted.

          f.   Means of egress are unobstructed.

          g.   The contractor can physically demonstrate
               immediate access or egress in these areas of the
               institution.

10.5.4    Determine through review of documentation and
          observation if:

     a.    Non-combustible receptacles have been provided exclusively for smoking materials in designated smoking areas.

     b.    Non-combustible containers have been provided for combustible refuse in all areas.

     c.    Special containers have been provided for flammable liquids and rags used with flammable liquids in all appropriate areas of the facility (e.g., garage, V.T., and facilities)

## 10.6  Radiation Safety

10.6.1    Review documentation to verify that medical/dental radiology equipment is tested in accordance with manufacturer's specifications and applicable regulations.